## NATIONAL FARMERS UNION INSURANCE COS.
## ET AL. *v.* CROW TRIBE OF INDIANS ET AL.

No. 84–320.   Argued April 16, 1985—Decided June 3, 1985

Stevens, J., delivered the opinion for a unanimous Court.

*Rodney T. Hartman* argued the cause for petitioners. With him on briefs was *Jack Ramirez.*

*Clay Riggs Smith,* Assistant Attorney General of Montana, argued the cause for the State of Montana et al. as *amici curiae* urging reversal. With him on the brief were *Michael T. Greely,* Attorney General of Montana, *Rick Bartos, Norman C. Gorsuch,* Attorney General of Alaska, *Robert K. Corbin,* Attorney General of Arizona, *Jim Jones,* Attorney General of Idaho, *Hubert H. Humphrey III,* Attorney General of Minnesota, *Paul Bardacke,* Attorney General of New Mexico, *Lacy Thornburg,* Attorney General of North Carolina, and *Robert E. Cansler,* Assistant Attorney General, *Michael Turpen,* Attorney General of Oklahoma, *Mark V. Meierhenry,* Attorney General of South Dakota, *Bronson C. La Follette,* Attorney General of Wisconsin, and *Archie G. McClintock,* Attorney General of Wyoming.

*Clarence T. Belue,* by appointment of the Court, 469 U. S. 1104, argued the cause for respondents and filed a brief for respondents Sage et al. *Robert S. Pelcyger* filed a brief for the Crow respondents.

*Deputy Solicitor General Claiborne* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General Lee,* and *Assistant Attorney General Habicht.* *

---

*Briefs of *amici curiae* urging reversal were filed for the State of Washington by *Kenneth O. Eikenberry,* Attorney General, and *Timothy R. Malone,* Assistant Attorney General; and for the Salt River Project Agricultural Improvement and Power District et al. by *Robert B. Hoffman* and *Frederick J. Martone.*

Briefs of *amici curiae* urging affirmance were filed for the Assiniboine and Sioux Tribes of the Fort Peck Reservation et al. by *Arthur Lazarus,*

JUSTICE STEVENS delivered the opinion of the Court.

A member of the Crow Tribe of Indians filed suit against the Lodge Grass School District No. 27 (School District) in the Crow Tribal Court and obtained a default judgment. Thereafter, the School District and its insurer, National Farmers Union Insurance Companies (National), commenced this litigation in the District Court for the District of Montana; that court was persuaded that the Crow Tribal Court had no jurisdiction over a civil action against a non-Indian and entered an injunction against further proceedings in the Tribal Court. The Court of Appeals reversed, holding that the District Court had no jurisdiction to enter such an injunction. We granted certiorari to consider whether the District Court properly entertained petitioners' request for an injunction under 28 U. S. C. § 1331. 469 U. S. 1032 (1984).

The facts as found by the District Court are not substantially disputed. On May 27, 1982, Leroy Sage, a Crow Indian minor, was struck by a motorcycle in the Lodge Grass Elementary School parking lot while returning from a school activity. The school has a student body that is 85% Crow Indian. It is located on land owned by the State within the boundaries of the Crow Indian Reservation. Through his guardian, Flora Not Afraid, Sage initiated a lawsuit in the Crow Tribal Court against the School District, a political subdivision of the State, alleging damages of $153,000, including medical expenses of $3,000 and pain and suffering of $150,000.

On September 28, 1982, process was served by Dexter Falls Down on Wesley Falls Down, the Chairman of the School Board. For reasons that have not been explained, Wesley Falls Down failed to notify anyone that a suit had been filed. On October 19, 1982, a default judgment was entered pursuant to the rules of the Tribal Court, and on

*Jr., W. Richard West, Jr., Reid Peyton Chambers, Kevin A. Griffin,* and *George E. Fettinger;* and for the Salt River Pima-Maricopa Indian Community et al. by *Rodney B. Lewis* and *Richard B. Wilks.*

October 25, 1982, Judge Roundface entered findings of fact, conclusions of law, and a judgment for $153,000 against the School District. *Sage* v. *Lodge Grass School District*, 10 Indian L. Rep. 6019 (1982). A copy of that judgment was hand-delivered by Wesley Falls Down to the school Principal who, in turn, forwarded it to National on October 29, 1982.

On November 3, 1982, National and the School District (petitioners) filed a verified complaint and a motion for a temporary restraining order in the District Court for the District of Montana. The complaint named as defendants the Crow Tribe of Indians, the Tribal Council, the Tribal Court, judges of the court, and the Chairman of the Tribal Council. It described the entry of the default judgment, alleged that a writ of execution might issue on the following day, and asserted that a seizure of school property would cause irreparable injury to the School District and would violate the petitioners' constitutional and statutory rights. The District Court entered an order restraining all the defendants "from attempting to assert jurisdiction over plaintiffs or issuing writs of execution out of Cause No. Civ. 82–287 of the Crow Tribal Court until this court orders otherwise." [1]

In subsequent proceedings, the petitioners filed an amendment to their complaint, invoking 28 U. S. C. § 1331 as a basis for federal jurisdiction,[2] and added Flora Not Afraid and Leroy Sage as parties defendant. After the temporary restraining order expired, a hearing was held on the defendants' motion to dismiss the complaint and on the plaintiffs' motion for a preliminary injunction. On December 29, 1982, the District Court granted the plaintiffs a permanent injunction against any execution of the Tribal Court judgment. 560 F. Supp. 213, 218 (1983). The basis "for the injunction

---

[1] Record, Doc. No. 6.

[2] Record, Doc. No. 14. In their original complaint, petitioners relied on 25 U. S. C. § 1302 and on 28 U. S. C. § 1343 as bases for federal jurisdiction.

was that the Crow Tribal Court lacked subject-matter jurisdiction over the tort that was the basis of the default judgment." *Id.*, at 214.

A divided panel of the Court of Appeals for the Ninth Circuit reversed. 736 F. 2d 1320 (1984). Without reaching the merits of petitioners' challenge to the jurisdiction of the Tribal Court, the majority concluded that the District Court's exercise of jurisdiction could not be supported on any constitutional, statutory, or common-law ground. *Id.*, at 1322–1323.[3] One judge dissented in part and concurred in the result, expressing the opinion that petitioners stated a federal common-law cause of action involving a substantial federal question over which subject-matter jurisdiction was conferred by 28 U. S. C. § 1331. He concluded, however, that the petitioners had a duty to exhaust their Tribal Court remedies before invoking the jurisdiction of a federal court, and therefore concurred in the judgment directing that the complaint be dismissed. *Id.*, at 1324–1326.[4]

---

[3] The Court of Appeals believed that the petitioners' due process and equal protection claims had no merit because Indian tribes are not constrained by the provisions of the Fourteenth Amendment. Further, although recognizing that the Tribe is bound by the Indian Civil Rights Act, 25 U. S. C. § 1301 *et seq.*, the Court of Appeals held that a federal court has no jurisdiction to enjoin violations of that Act. See *Santa Clara Pueblo* v. *Martinez*, 436 U. S. 49 (1978). Finally, although the majority assumed that a complaint alleging that a tribe had abused its regulatory jurisdiction would state a claim arising under federal common law, it concluded that a claim that a tribe had abused its adjudicatory jurisdiction could not be recognized because Congress, by enacting the Indian Civil Rights Act, had specifically restricted federal court interference with tribal court proceedings to review on petition for habeas corpus.

[4] After the District Court's injunction was vacated, tribal officials issued a writ of execution on August 1, 1984, and seized computer terminals, other computer equipment, and a truck from the School District. A sale of the property was scheduled for August 22, 1984. On that date, the School District appeared in the Tribal Court, attempting to enjoin the sale and to set aside the default judgment. App. to Brief in Opposition 1a–9a. The

I

Section 1331 of the Judicial Code provides that a federal district court "shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."[5] It is well settled that this statutory grant of "jurisdiction will support claims founded upon federal common law as well as those of a statutory origin."[6] Federal common law as articulated in rules that are fashioned by court decisions are "laws" as that term is used in § 1331.[7]

Thus, in order to invoke a federal district court's jurisdiction under § 1331, it was not essential that the petitioners base their claim on a federal statute or a provision of the Constitution. It was, however, necessary to assert a claim "arising under" federal law. As Justice Holmes wrote for the Court, a "suit arises under the law that creates the cause

Tribal Court stated that it could not address the default-judgment issue "without a full hearing, research, and briefs by counsel," *id.*, at 4a; that it would consider a proper motion to set aside the default judgment; and that the sale should be postponed. Petitioners also proceeded before the Court of Appeals, which denied an emergency motion to recall the mandate on August 20, 1984. The next day JUSTICE REHNQUIST granted the petitioners' application for a temporary stay. On September 10, 1984, he continued the stay pending disposition of the petitioners' petition for certiorari. 469 U. S. 1032 (1984). On September 19, the Tribal Court entered an order postponing a ruling on the motion to set aside the default judgment until after final review by this Court. App. to Brief in Opposition 15a. Subsequently, the Court of Appeals stayed all proceedings in the District Court. On April 24, 1985, JUSTICE REHNQUIST denied an application to "dissolve" the Court of Appeals' stay. *Post*, p. 1301.

[5] 28 U. S. C. § 1331.

[6] *Illinois* v. *City of Milwaukee*, 406 U. S. 91, 100 (1972).

[7] See *Romero* v. *International Terminal Operating Co.*, 358 U. S. 354, 392–393 (1959) (opinion of BRENNAN, J.); cf. *County of Oneida* v. *Oneida Indian Nation*, 470 U. S. 226, 235–236 (1985); *Texas Industries, Inc.* v. *Radcliff Materials, Inc.*, 451 U. S. 630, 640 (1981); *United States* v. *Little Lake Misere Land Co.*, 412 U. S. 580, 592–593 (1973); *Erie R. Co.* v. *Tompkins*, 304 U. S. 64, 78–79 (1938).

of action."[8]   Petitioners contend that the right which they assert—a right to be protected against an unlawful exercise of Tribal Court judicial power—has its source in federal law because federal law defines the outer boundaries of an Indian tribe's power over non-Indians.

As we have often noted, Indian tribes occupy a unique status under our law.[9]   At one time they exercised virtually unlimited power over their own members as well as those who were permitted to join their communities.   Today, however, the power of the Federal Government over the Indian tribes is plenary.[10]   Federal law, implemented by statute, by treaty, by administrative regulations, and by judicial decisions, provides significant protection for the individual, territorial, and political rights of the Indian tribes.   The tribes also retain some of the inherent powers of the self-governing political communities that were formed long before Europeans first settled in North America.[11]

This Court has frequently been required to decide questions concerning the extent to which Indian tribes have retained the power to regulate the affairs of non-Indians.[12]   We

---

[8]*American Well Works Co.* v. *Layne and Bowler Co.*, 241 U. S. 257, 260 (1916).

[9]See, *e. g.*, *United States* v. *Wheeler*, 435 U. S. 313, 323 (1978); *United States* v. *Mazurie*, 419 U. S. 544, 557 (1975); cf. *Turner* v. *United States*, 248 U. S. 354, 354–355 (1919).

[10]*Escondido Mutual Water Co.* v. *La Jolla Bands of Mission Indians*, 466 U. S. 765, 788, n. 30 (1984) ("[A]ll aspects of Indian sovereignty are subject to defeasance by Congress"); *Rice* v. *Rehner*, 463 U. S. 713, 719 (1983); *White Mountain Apache Tribe* v. *Bracker*, 448 U. S. 136, 143 (1980); *United States* v. *Wheeler*, 435 U. S., at 323.

[11]*White Mountain Apache Tribe* v. *Bracker*, 448 U. S., at 142; *Santa Clara Pueblo* v. *Martinez*, 436 U. S., at 55–56.

[12]Thus, in recent years we have decided whether a tribe has the power to regulate the sale of liquor on a reservation, *Rice* v. *Rehner, supra;* the power to impose a severance tax on oil and gas production by non-Indian lessees, *Merrion* v. *Jicarilla Apache Tribe*, 455 U. S. 130 (1982); the power to regulate hunting and fishing, *Montana* v. *United States*, 450 U. S. 544

have also been confronted with a series of questions concerning the extent to which a tribe's power to engage in commerce has included an immunity from state taxation.[13]  In all of these cases, the governing rule of decision has been provided by federal law.  In this case the petitioners contend that the Tribal Court has no power to enter a judgment against them.  Assuming that the power to resolve disputes arising within the territory governed by the Tribe was once an attribute of inherent tribal sovereignty, the petitioners, in essence, contend that the Tribe has to some extent been divested of this aspect of sovereignty.  More particularly, when they invoke the jurisdiction of a federal court under § 1331, they must contend that federal law has curtailed the powers of the Tribe, and thus afforded them the basis for the relief they seek in a federal forum.

The question whether an Indian tribe retains the power to compel a non-Indian property owner to submit to the civil jurisdiction of a tribal court is one that must be answered by reference to federal law and is a "federal question" under § 1331.[14]  Because petitioners contend that federal law has

---

(1981), *Puyallup Tribe* v. *Washington Dept. of Game,* 433 U. S. 165 (1977); and the power to tax the sale of cigarettes to non-Indians, *Washington* v. *Confederated Tribes of Colville Indian Reservation,* 447 U. S. 134 (1980).

[13] See, *e. g.*, *Mescalero Apache Tribe* v. *Jones,* 411 U. S. 145 (1973); cf. *White Mountain Apache Tribe* v. *Bracker, supra.*

[14] We have recognized that federal law has sometimes diminished the inherent power of Indian tribes in significant ways.  As we stated in *United States* v. *Wheeler,* 435 U. S., at 323–326:

"Their incorporation within the territory of the United States, and their acceptance of its protection, necessarily divested them of some aspects of the sovereignty which they had previously exercised. . . . In sum, Indian tribes still possess those aspects of sovereignty not withdrawn by treaty or statute, or by implication as a necessary result of their dependent status.

.     .     .     .     .

"The areas in which such implicit divestiture of sovereignty has been held to have occurred are those involving the relations between an Indian tribe and nonmembers of the tribe.  Thus, Indian tribes can no longer freely alienate to non-Indians the land they occupy.  *Oneida Indian Nation* v. *County of Oneida,* 414 U. S. 661, 667–668; *Johnson* v. *M'Intosh,*

divested the Tribe of this aspect of sovereignty, it is federal law on which they rely as a basis for the asserted right of freedom from Tribal Court interference. They have, therefore, filed an action "arising under" federal law within the meaning of § 1331. The District Court correctly concluded that a federal court may determine under § 1331 whether a tribal court has exceeded the lawful limits of its jurisdiction.

## II

Respondents' contend that, even though the District Court's jurisdiction was properly invoked under § 1331, the Court of Appeals was correct in ordering that the complaint be dismissed because the petitioners failed to exhaust their remedies in the tribal judicial system. They further assert that the underlying tort action "has turned into a procedural and jurisdictional nightmare" because petitioners did not pursue their readily available Tribal Court remedies. Petitioners, in response, relying in part on *Oliphant* v. *Suquamish Indian Tribe*, 435 U. S. 191 (1978), assert that resort to exhaustion as a matter of comity "is manifestly inappropriate."

In *Oliphant* we held that the Suquamish Indian Tribal Court did not have criminal jurisdiction to try and to punish non-Indians for offenses committed on the reservation. That holding adopted the reasoning of early opinions of two United States Attorneys General,[15] and concluded that fed-

---

8 Wheat. 543, 574. They cannot enter into direct commercial or governmental relations with foreign nations. *Worcester* v. *Georgia*, 6 Pet. 515, 559; *Cherokee Nation* v. *Georgia*, 5 Pet., at 17–18; *Fletcher* v. *Peck*, 6 Cranch 87, 147 (Johnson, J., concurring). And, as we have recently held, they cannot try nonmembers in tribal courts. *Oliphant* v. *Suquamish Indian Tribe* [435 U. S. 191 (1978)]."

[15] We stated:

"Faced by attempts of the Chocktaw Tribe to try non-Indian offenders in the early 1800's the United States Attorneys General also concluded that the Choctaws did not have criminal jurisdiction over non-Indians absent congressional authority. See 2 Op. Atty. Gen. 693 (1834); 7 Op. Atty. Gen. 174 (1855). According to the Attorney General in 1834, tribal criminal jurisdiction over non-Indians is, *inter alia*, inconsistent with treaty

eral legislation conferring jurisdiction on the federal courts to try non-Indians for offenses committed in Indian Country had implicitly pre-empted tribal jurisdiction. We wrote:

"While Congress never expressly forbade Indian tribes to impose criminal penalties on non-Indians, we now make express our implicit conclusion of nearly a century ago that Congress consistently believed this to be the necessary result of its repeated legislative actions." *Id.*, at 204.

If we were to apply the *Oliphant* rule here, it is plain that any exhaustion requirement would be completely foreclosed because federal courts would *always* be the only forums for civil actions against non-Indians. For several reasons, however, the reasoning of *Oliphant* does not apply to this case. First, although Congress' decision to extend the criminal jurisdiction of the federal courts to offenses committed by non-Indians against Indians within Indian Country supported the holding in *Oliphant*, there is no comparable legislation granting the federal courts jurisdiction over civil disputes between Indians and non-Indians that arise on an Indian reservation.[16] Moreover, the opinion of one Attorney General on which we relied in *Oliphant*, specifically noted the difference between civil and criminal jurisdiction. Speaking of civil jurisdiction, Attorney General Cushing wrote:

"But there is no provision of treaty, and no statute, which takes away from the Choctaws jurisdiction of a case like this, a question of property strictly internal to the Chocktaw nation; nor is there any written law which

provisions recognizing the sovereignty of the United States over the territory assigned to the Indian nation and the dependence of the Indians on the United States." 435 U. S., at 198–199.

[16] F. Cohen, Handbook of Federal Indian Law 253 (1982) ("The development of principles governing civil jurisdiction in Indian Country has been markedly different from the development of rules dealing with criminal jurisdiction").

confers jurisdiction of such a case in any court of the United States.

.      .      .      .      .

"The conclusion seems to me irresistible, not that such questions are justiciable nowhere, but that they remain subject to the local jurisdiction of the Chocktaws.

.      .      .      .      .

"Now, it is admitted on all hands . . . that Congress has 'paramount right to legislate in regard to this question, in all its relations. *It has legislated, in so far as it saw fit, by taking jurisdiction in criminal matters, and omitting to take jurisdiction in civil matters. . . . By all possible rules of construction the inference is clear that jurisdiction is left to the Choctaws themselves of civil controversies arising strictly within the Choctaw Nation.*" 7 Op. Atty. Gen. 175, 179–181 (1855) (emphasis added).[17]

Thus, we conclude that the answer to the question whether a tribal court has the power to exercise civil subject-matter jurisdiction over non-Indians in a case of this kind is not automatically foreclosed, as an extension of *Oliphant* would require.[18] Rather, the existence and extent of a tribal court's jurisdiction will require a careful examination of tribal sovereignty, the extent to which that sovereignty has been

---

[17] A leading treatise on Indian law suggests strongly that Congress has had a similar understanding:

"In the civil field, however, Congress has never enacted general legislation to supply a federal or state forum for disputes between Indians and non-Indians in Indian country. Furthermore, although treaties between the federal government and Indian tribes sometimes required tribes to surrender non-Indian criminal offenders to state or federal authorities, Indian treaties did not contain provision for tribal relinquishment of civil jurisdiction over non-Indians." *Id.*, at 253–254.

[18] Cf. *Kennerly* v. *District Court of Montana,* 400 U. S. 423 (1971); *Williams* v. *Lee,* 358 U. S. 217 (1959).

altered, divested, or diminished,[19] as well as a detailed study of relevant statutes, Executive Branch policy as embodied in treaties and elsewhere, and adminstrative or judicial decisions.

We believe that examination should be conducted in the first instance in the Tribal Court itself. Our cases have often recognized that Congress is committed to a policy of supporting tribal self-government and self-determination.[20] That policy favors a rule that will provide the forum whose jurisdiction is being challenged the first opportunity to evaluate the factual and legal bases for the challenge.[21] Moreover the orderly administration of justice in the federal court will be served by allowing a full record to be developed in the Tribal Court before either the merits or any question concerning appropriate relief is addressed.[22] The risks of the kind of "procedural nightmare" that has allegedly developed in this case

[19] See, e. g., New Mexico v. Mescalero Apache Tribe, 462 U. S. 324, 331–332 (1983); Merrion v. Jicarilla Apache Tribe, 455 U. S., at 137; Washington v. Confederated Tribes of Colville Indian Reservation, 447 U. S., at 152.

[20] New Mexico v. Mescalero Apache Tribe, 462 U. S., at 332; Merrion v. Jicarilla Apache Tribe, 455 U. S., at 138, n. 5; White Mountain Apache Tribe v. Bracker, 448 U. S., at 143–144, and n. 10; Morton v. Mancari, 417 U. S. 535, 551 (1974); Williams v. Lee, 358 U. S., at 223.

[21] We do not suggest that exhaustion would be required where an assertion of tribal jurisdiction "is motivated by a desire to harass or is conducted in bad faith," cf. Juidice v. Vail, 430 U. S. 327, 338 (1977), or where the action is patently violative of express jurisdictional prohibitions, or where exhaustion would be futile because of the lack of an adequate opportunity to challenge the court's jurisdiction.

[22] Four days after receiving notice of the default judgment, petitioners requested that the District Court enter an injunction. Crow Tribal Court Rule of Civil Procedure 17(d) provides that a party in a default may move to set aside the default judgment at any time within 30 days. App. 17. Petitioners did not utilize this legal remedy. It is a fundamental principle of long standing that a request for an injunction will not be granted as long as an adequate remedy at law is available. See, e. g., Rondeau v. Mosinee Paper Corp., 422 U. S. 49, 57 (1975); Sampson v. Murray, 415 U. S. 61, 88 (1974).

will be minimized if the federal court stays its hand until after the Tribal Court has had a full opportunity to determine its own jurisdiction[23] and to rectify any errors it may have made.[24]   Exhaustion of tribal court remedies, moreover, will encourage tribal courts to explain to the parties the precise basis for accepting jurisdiction, and will also provide other courts with the benefit of their expertise in such matters in the event of further judicial review.[25]

## III

Our conclusions that § 1331 encompasses the federal question whether a tribal court has exceeded the lawful limits of its jurisdiction, and that exhaustion is required before such a claim may be entertained by a federal court, require that we reverse the judgment of the Court of Appeals.   Until petitioners have exhausted the remedies available to them in the Tribal Court system, n. 4, *supra,* it would be premature for a federal court to consider any relief.   Whether the federal action should be dismissed, or merely held in abeyance pending the development of further Tribal Court proceedings, is a question that should be addressed in the first instance by the District Court.   Accordingly, the judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

---

[23] C. Wright, Handbook of the Law of Federal Courts § 16 (1976).

[24] Cf. *Weinberger* v. *Salfi,* 422 U. S. 749, 765 (1975).

[25] *Ibid.;* see, *e. g., North Dakota ex rel. Wefald* v. *Kelly,* 10 Indian L. Rep. 6059 (1983); *Crow Creek Sioux Tribe* v. *Buum,* 10 Indian L. Rep. 6031 (1983).