# District Court of the Navajo Nation
## Judicial District of Shiprock, New Mexico

**Boyd & McWilliams Energy Group, Inc.,**
**a Texas corporation, Plaintiff,**
**v.**
**Andrew Tso, an individual;**
**Johnny Johnson, an individual;**
**Andrew Mark, an individual;**
**and John Does 1 through 100, individuals,**
**Defendants.**
**Decided March 21, 1994**

## ORDER GRANTING PLAINTIFF INJUNCTIVE RELIEF

Judge Lorene Ferguson presiding.

This matter comes before this Court on a Petition for a Preliminary Injunction to enjoin defendants from interfering with the drilling of a well known as Turquoise Horse Well #1 located on McCracken Mesa, Utah. Plaintiff, Boyd and McWilliams Energy Group, Inc., pursuant to a Farmout Agreement with Giant Exploration/ANR Production Company, was required to commence drilling on or before January 1, 1994. Failure to begin drilling by January 1 would result in termination of the Farmout Agreement.

Plaintiff began well-site preparations on November 29, 1993. Plaintiff had secured a drilling rig on December 1, 1993, pursuant to a contract which required plaintiff to either use the rig or to pay a daily stacking charge of $5,395.00. The drilling supervisor began preparation of a drill pad at the well-site on December 1, 1993. At approximtely 11:30 a.m., he was approached by defendant Andrew Tso, a council delegate from Aneth Chapter. Tso demanded that plaintiff immediately cease work. Tso was later joined by several other named defendants who are also from the Aneth community. The drilling operator decided to cease operations and when he returned the next day, a barbed wire fence was erected across the access road to the well-site.

Plaintiff obtained a Temporary Restraining Order (TRO) from the U.S. District Court for the District of Utah. However, plaintiff believed that the federal restraining order may not be enforced by Tribal officials. Therefore, they sought injunctive relief from the Navajo District Court in Shiprock, New Mexico on the same day a federal Preliminary Injunction was issued.

On December 17, 1993, this Court granted a TRO which enjoined defendants from interfering with the commencement of drilling operations pending a hearing for a Preliminary Injunction. Plaintiff sought to have its federal Preliminary Injunction domesticated or "acknowledged and enforced by this Court," or in the

alternative, this Court enter its own injunction. This Court issued a TRO on independent grounds.

A hearing was held on December 28, 1993. The parties appeared and stated they were ready to proceed, even though defendants did not have legal counsel. However, during the first witness' testimony and upon the Court's inquiry as to whether defendants objected to submission of documents as exhibits, defendants requested a continuance. Defendants informed the Court they did not wish to proceed without the services of an attorney. Although the parties were reminded of the nature of the suit and the requirement that a hearing be held within 15 days, the parties stipulated to a continuance. The TRO was extended until the hearing set for January 14, 1994. On January 13, 1994, William Battles submitted an Entry of Appearance on behalf of defendants. All parties appeared at the January 14, 1994 hearing.

## FACTUAL BACKGROUND

McCracken Mesa was added to the Navajo Reservation as part of a land exchange agreement entered into between the Navajo Nation and the United States of America. See Congressional Act of September 02, 1958 (72 Stat. 1686) and Public Land Order No. 3397, May 18, 1964. The Navajo Nation gave up 53,000 acres of the Navajo Reservation in the area now known as Page, Arizona, in exchange for 48,726.78 acres in the McCracken Mesa which is within the Aneth Chapter area. The United States had plans to build the Glen Canyon Dam near Page, Arizona. In exchange, the U.S. Government transferred only the surface rights of McCracken Mesa to the Navajo Nation. Both the Navajo Tribe and the U.S. Government retained mineral rights in the lands they gave up. Consequently, the McCracken Mesa, within the Aneth Chapter area, is a split estate where the subsurface or mineral rights are managed by the U.S. Department of the Interior, Bureau of Land Management (BLM). Whereas, the surface estate is managed by the Bureau of Indian Affairs (BIA).

It was known that McCracken Mesa had important oil and gas reserves at the time of the exchange. In fact, one concern of the exchange was to protect the oil companies that held leases in McCracken Mesa area. On the other hand, the mineral known to exist on the land given up by the Navajo Tribe is low grade copper. The U.S. Government further imposed restrictions on extraction of the low grade copper. Questions of equivalent value of exchanged acreage was expressly avoided.

The Exchange Act (Act) granted residence and use rights in the McCracken Mesa area and authorized the Navajo Tribal Council to give preference to those Navajos, who prior to the Act, used or occupied the transferred lands and those Navajos who have used or occupied other public lands in San Juan County, Utah. However, those Navajos have not been allowed to settle and obtain grazing permits. In spite of being precluded from vesting their rights, numerous Navajos

continue to reside on the exchanged land as they had prior to the exchange.

Historically, disputes over grazing was the basis of friction between non-Indian grazing permittees and Navajos on McCracken Mesa. This demonstrates the suitability of the area for grazing purposes. In fact, McCracken Mesa was described as an area suitable for grazing before the enactment of the land exchange and was considered to be an attractive factor for the exchange. Yet, individual Navajos are precluded from claiming grazing rights to this area because the Navajo Nation Government and the Bureau of Indian Affairs, the entities entrusted with such duties, have failed to issue grazing permits.

What surface rights retained by the Navajos are further eroded by the oil companies' use of the surface area for egress and ingress to extract the minerals. This, in effect, prevents the Navajos who occupy the area from living in an area free from interference and in tranquility. Subsection 6 of the Act provides for conditions on the extraction of mineral rights to protect surface use of the Tribe. Mineral activity was to be regulated by rules promulgated by the Secretary of Interior to protect the surface interest of the Navajo. But, it is clear that little protection of the surface has occurred. This is the root of the frustration illustrated by defendants' actions.

## COMITY

The Petition for a TRO and Preliminary Injunction requested this Court to adopt the federal Preliminary Injunction (federal order) based on the principle of comity or in the alternative to issue a restraining order on its own. This Court chose to issue a restraining order on independent grounds based on Navajo and federal law.

In *Anderson v. Chuska Energy & Pertroleum Company*, 4 Nav. R. 187, 189 (W.R. District Court 1983), the Court Stated that the "Navajo Courts will honor and enforce foreign judgments upon consideration of the rights of the foreign court to issue the judgment, of the propriety of the proceedings and of any relevant public policy of the Navajo Nation." Hence, the query is whether the U.S. District Court of Utah properly issued its order in accordance to federal law and Navajo public policy?

Federal policy and case law dictate that deference should be granted to the Tribal Courts to hear matters where the subject of the dispute arises within the boundaries of the Navajo Nation and involve members of the Navajo Tribe.

In *Texaco, Inc. v. Zah*, 5 F.3d 1374, 1376 (10th Cir. 1993), the U.S. Court of Appeals, citing *Tillett v. Lujan*, 931 F.2d 636, 640 (10th Cir. 1991), stated the rule that "as a matter of comity, a federal court should not exercise jurisdiction over cases arising under its federal question or diversity jurisdiction, if those cases are also subject to Tribal jurisdiction until the parties have exhausted their Tribal remedies." This rule is known as the "exhaustion rule" and the deference both state and federal courts must afford Tribal Courts concerning activities occurring on reservation land. It is deeply rooted in Supreme Court precedent. See, *U.S. v. Plainbull*, 957 F.2d 724, 727 (9th Cir. 1992).

In *National Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 845 (1985), the U.S. Supreme Court considered three factors to determine whether the "exhaustion rule" should apply: 1) Whether there is furtherance of congressional policy of supporting Tribal self-government; 2) Whether orderly administration of justice is promoted; and 3) Whether in applying the rule, there would be the benefit of Tribal expertise.

Petitioner contends that the "exhaustion rule" is inapplicable to the case at bar because the Navajo Nation government is not a party. It is immaterial that the Navajo Nation is not a party. Instead, whether the matter is heard in the respective Tribal forum and furthers the congressional policy of supporting Tribal self-government is the pivotal question. Here, the dispute arose within the exterior boundaries of the Navajo Nation and the respondents are Tribal members whose quality of life surrounding the well-site is affected. Resolution of these types of disputes promote Tribal self-government and also encourage the development of Tribal courts.

The second and third considerations outlined in *National Farmers Union, supra*, are also present. Petitioner was not assured that the federal order would be enforced within the Navajo Nation boundaries so petitioner asked this Court to issue a TRO so that drilling could commence without interference. This Court accepted the petition to promote an orderly administration of justice pending a hearing on the issuance of the Preliminary Injunction and merits of the case. Finally, since the issues raised by respondents are recurring, the petitioner stands to benefit by helping the respondents understand how drilling leases are obtained and how respondents may appeal to the responsible Navajo governmental entities to assist them in various ways. Petitioner and other oil companies with leases will benefit by addressing these issues in a Tribal forum because when a case is heard in Tribal Court, resolution of the dispute comes within the availability of Tribal expertise.

The "exhaustion rule" applies to this case. There are three exceptions to the "exhaustion rule" but plaintiff did not raise them so they will not be addressed. There is a strong federal policy that favors resolution of these types of disputes in a non-federal forum and "as a matter of comity," the federal courts should decline to hear a case. See, *Zah* 5 F.3d at 1377. In conclusion, it is this Court's opinion that petitioners should have sought a remedy in this Court in the first instance and that is why their request that this Court adopt the federal order is denied.

## PRELIMINARY INJUNCTION AND FINDINGS ON THE MERITS OF THE LAW

At a hearing for a Preliminary Injunction, petitioner must show:

1) that he has or is claiming a protectable right or interest and has a high likelihood of success on the merits;

2) that irreparable injury, loss or damage to that right or interest is likely to occur unless the Preliminary Injunction is issued;

3) that the threatened injury, loss, or damage is substantial in nature or character; and

4) that the moving party does not have an adequate remedy at law.

See Navajo Rules of Civil Procedure 65(c).

### 1) Protectable Right or Interest and a High Likelihood of Success on the Merits

Boyd & McWilliams has an exclusive right to drill on McCracken Mesa pursuant to the Farmout Agreement entered into between the petitioner and Giant Exploration/ANR Production Company. The Farmout Agreement provides petitioner a right to the subsurface oil and it has been granted a permit to drill by the Bureau of Land Management, the government agency that is entrusted with the authority to grant such pemits regarding the land status at McCracken Mesa. The BIA has also granted clearance pursuant to its procedures. The Court finds that petitioner has shown it meets this element.

Respondents raised questions regarding the legality of petitioner's right to drill for oil. They question whether petitioner should have obtained approval from the Resources Committee (Committee) of the Navajo Tribal Council and whether a moratorium to halt all future oil drilling effectively prohibits petitioner from drilling. The moratorium was passed by the Aneth Chapter and the Committee. Respondents also contend that a "20-points Agreement" is applicable to petitioner's drilling operations. The "Agreement" was signed by representatives of then Chairman Peter MacDonald and representatives of the BIA and three oil companies. Petitioner is not one of the three companies. The "Agreement" was entered on April 3, 1978, which demanded that these parties abide by some specific guidelines that the Aneth Chapter felt was appropriate to protect its interests.

The Court will discuss briefly the foregoing questions raised by respondents, to address what they believe may preclude petitioner's right to drill. The Committee is authorized to oversee and regulate all activities within Navajo Nation land including action which may involve disposition or acquisition of resources, surface disturbance or alteration of the natural state of the resources. See 2 N.T.C. Section 695(b)(11). Respondents contend that the Committee is authorized to grant rights of way and approve drilling operations.

While it appears that the Committee may have some oversight over operations that may adversely affect the surface rights of individual Navajos who reside thereon, there is no express provision that the Committee must approve rights of way for split estates. Records show that petitioner made an attempt to obtain approval of surface use from the Navajo Nation. The Committee, however, did not address the matter. Minutes of a Committee meeting were submitted as evidence and the minutes show that the Committee lacked authority to review or approve drilling operations in the McCracken Mesa area.

The Aneth Chapter has attempted to impose a moratorium on mineral extraction within its community. On November 7, 1993, the Aneth Chapter passed a

Moratorium Resolution to halt all new and future oil and gas development within the boundaries of the Aneth Chapter. This is an attempt by Navajo individuals to protect lands that they have a future interest in, which have not vested because certain officials have not followed through. Petitioner secured its lease prior to the passage of the Moratorium to halt new leases. Thus, Boyd & McWilliam's Farmout Agreement is not a new lease subject to the Moratorium. The validity of the Moratorium is also questionable because it does not have an affect on the subsurface rights retained by the U.S. Government. Nevertheless, the Navajo people of Aneth Chapter do raise valid concerns regarding damages to the surface area.

Perhaps the concerns raised by the Aneth residents, who claim an interest in the McCracken Mesa area, must be addressed to those entities that are in a position to change the current procedures with approval of oil and gas permits. To wit, the Navajo Nation, the Bureau of Indian Affairs and the Bureau of Land Management. Petitioner has legally obtained a permit to drill under the current procedures set forth by law.

### 2) Irreparable Injury, Loss or Damage to its Protectable Right unless the Preliminary Injunction is Issued

Petitioner has shown that without injunctive relief it would be faced with immediate irreparable harm in that the Farmout Agreement dictated that drilling was to commence on or before January 1, 1994. If drilling is not commenced by January 1, petitioner would lose the right to drill. Also, it was shown that petitioner could suffer incalculable future damages and has already incurred extensive administrative and actual drilling financial costs. These types of damages cannot be adequately remedied in a Court of law and this constitutes irreparable injury. *Injunctions*, 42 Am Jur. 2d Sec. 49

### 3) The Threatened Injury, Loss or Damage is Substantial in Nature or Character

The Court is satisfied that the acts restrained constitute an injurious invasion of a legal and protectable right. As stated above, petitioner was subject to losing its right to drill if it is not commenced on or by January 1, 1994, which would result in an actual loss of a substantial right. *Injunctions*, 42 Am Jur. 2d Sec. 29

### 4) Moving Party Does Not Have an Adequate Remedy at Law

Petitioner has demonstrated that it will lose its right to drill if drilling is not commenced by January 1, a right that provides further rights if a well is producing. Any further delay would be costly and petitioner sought the only relief that was available given the time constraints. Thus, the petitioner did not have an adequate remedy at law.

A remedy which prevents a threatening wrong or damage is better than one which provides for payment of damages caused thereby and application for an

injunction need not be delayed until injury has actively been inflicted. *Injunctions*, 42 Am Jur. 2d Sec. 31

## CONCLUSION

It is the duty of the Court whose jurisdiction is invoked to grant or deny injunctive relief, after considering and weighing the relative conveniences and inconveniences and the comparative injuries to the parties and to the public which would result from the granting or refusal of the injunction sought. *Injunctions*, 42 Am Jur. 2d Sec. 56

Respondents raised community interests in protecting the land because individual Navajos are living on the land and said land was suited for grazing livestock. Ancillary to these interests is a desire to protect the environment so the land, water, and air can remain suitable for future settlement and grazing.

However, petitioner is rightfully on the premises and involved in activities which are legal. Moreover, petitioner is not preventing respondents from being issued grazing permits nor is it preventing settlement efforts mandated by the Land Exchange Act. While these concerns weigh heavily in balancing the interests, petitioner is not in the position to remedy these concerns here. Furthermore, petitioner is not a party to the "20-points Agreement." The BLM/BIA environmental safeguards are similar to some of those outlined in the "20-points Agreement." It has not been shown to the Court that petitioner will not comply or is not currently complying with environmental safeguards required by the BIA.

Respondents are not without a remedy. The Navajo Nation Government and the BIA are the entities charged with the responsibility of ensuring that the Land Exchange Act is complied with. Failure to do so creates hardship and injury to the Aneth Chapter people. Respondents should work with these entities to solve their problems.

IT IS ORDERED THAT petitioner shall be granted a Preliminary Injunction to enjoin respondents, their officers, agents, servants, employees and those persons in active concert or participation with them, from interfering with the drilling of the well, known as Turquoise Horse Well #1 (in the NW¼NE¼ of Section 8 of Township 39 South, Range 24 East, SLN) at McCracken Mesa.

AND IT IS FURTHER ORDERED THAT the Preliminary Injunction is made permanent until the drilling operations are completed or until further ordered by this Court.