**LANDMARK GOLF LIMITED PARTNERSHIP, Plaintiff,**

v.

**The LAS VEGAS PAIUTE TRIBE, et al., Defendants.**

**No. CV–S–98–602–PMPLRL.**

United States District Court, D. Nevada.

March 26, 1999.

J.D. Horton, Quinn Emanuel Urquhart Oliver & Hedges, LLP, Los Angeles, CA, Shaun P. Martin, Solana Beach, CA, for plaintiff Landmark Golf Limited Partnership.

Vernle C. Durocher, Jr., Dorsey & Whitney LLP, Minneapolis, MN, for defendants.

## ORDER

PRO, District Judge.

Before the Court is the Report and Recommendation of United States Magistrate Judge Lawrence R. Leavitt (# 49), filed March 4, 1999, regarding Defendants' Motion to Dismiss (# 21). Objections were filed by Plaintiff in accordance with Local Rule IB 3–2 of the Rules of Practice of the United States District Court for the District of Nevada (# 51 and # 52) on March 11, 1999, to which Defendants Replied (# 53) on March 25, 1999.

The Court has conducted a *de novo* review of the record in this case in accordance with 28 U.S.C. § 636(b)(1)(B) and (C) and Local Rule IB 3–2 and determines that the Report and Recommendation of

the United States Magistrate of March 4, 1999, should be affirmed.

IT IS THEREFORE ORDERED that the Magistrate's Report and Recommendation of March 4, 1999, is affirmed, Defendants' Motion to Dismiss (# 21) is granted.

## REPORT & RECOMMENDATION
(Motion to Dismiss—# 21)

LEAVITT, United States Magistrate Judge.

This is an action by Landmark Golf Limited Partnership ("Landmark"), a golf resort developer, for declaratory relief against the Las Vegas Paiute Tribe (the "Tribe") and the Snow Mountain Recreational Facilities Authority (the "Authority"), and for damages against individual members of the Tribe. Landmark seeks a declaration that the Tribe and the Authority are bound by a 30–year contract they entered into with Landmark in February, 1995. Now before the Court is the Tribe's Motion to Dismiss (# 21, filed July 2, 1998), which asserts four separate grounds: the Court is without subject matter jurisdiction; the defendants enjoy sovereign immunity from suit in federal court; the Tribe and the Authority are indispensable parties that cannot remain in this suit; and Landmark has not exhausted its tribal remedies.

The Court has considered the motion; plaintiff's Opposition ( 24, 25, 28, and 29, filed July 24, 1998);[1] the Declaration of J.D. Horton in Support of Opposition (# 26, filed July 24, 1998); the Declaration of Ernest O. Vossler in Support of Opposition (# 27, filed July 24, 1998); defendants' Reply (# 45, filed October 1, 1998); and the arguments presented by counsel at the hearing on January 14, 1999. The Court recommends that the motion to dismiss be granted on the ground that Landmark has failed to exhaust tribal remedies in the Las Vegas Paiute Tribal Court. In light of this recommendation, the court does not reach defendants' other three grounds for dismissal.

## BACKGROUND

The Authority is a governmental instrumentality created by the Tribe to develop recreational facilities on its Snow Mountain Reservation. Landmark develops and manages golf resorts. In early 1994, the Tribe and Landmark began negotiating a management agreement under which Landmark would develop and operate golf courses on the reservation, and a consulting agreement under which seven hotels and 600 acres of auxiliary commercial facilities would be developed on the reservation. The Tribe hoped to obtain tax-exempt financing for the golf-related facilities. To obtain tax-exempt status for the financing, the Tribe would have to meet certain requirements of the Internal Revenue Code ("IRC"), among which was the requirement that the Tribe reserve the right to terminate the management agreement without cause after three years.

Although tax-exempt financing had not been secured, in February 1995 the parties entered into a management agreement with a fixed term of thirty years, which called for Landmark to develop and manage a golf resort in return for a variety of fees, including a "commission" fee that would be derived from the development of the future hotels and related facilities. The agreement provided that if tax-exempt financing became available, the agreement would be renegotiated so as to comply with the IRC and at the same time provide to Landmark the same aggregate compensation it expected to receive under the original agreement. In March, 1995, the original agreement was approved by the Department of Interior pursuant to 25 U.S.C. § 81.

In May 1995, the Tribe secured a $12.5 million tax-exempt loan to finance the de-

---

1. Plaintiff filed a separate response in opposition to each ground for dismissal raised by defendants.

velopment of a golf resort. In June 1995, the Authority, the Tribe, and Landmark executed three new agreements to replace the original agreement: a management agreement, a consulting agreement, and a novation agreement.[2] The management agreement carried a term of five years but gave the Authority the right of termination without cause after three years. The consulting agreement carried a fixed term of thirty years. Importantly, it also provided that if the Tribe terminated the consulting agreement, the Tribe would be obligated to make a buyout payment to Landmark in the sum of $8,000,000. The purpose of the buyout provision was to ensure that under the replacement agreements Landmark would receive the same aggregate compensation contemplated in the original agreement. The Department of Interior approved the management agreement and the novation agreement. The Tribe did not seek approval of the consulting agreement. On March 1, 1998, the Authority terminated the management agreement. The consulting agreement has not been terminated.

On June 8, 1998, Landmark filed its First Amended Complaint.[3] Landmark alleges that the Authority was having a difficult time finding a way to replace the original agreement with agreements that would both satisfy the IRC requirements and provide Landmark with the compensation the parties had originally agreed upon. According to Landmark, the Authority claimed that the IRC precluded it from receiving tax-exempt financing under a management agreement that carried a thirty-year term. Landmark claims it objected to any agreement that would not provide it with the same compensation pro-

vided under the original agreement. Landmark further alleges it was not satisfied with the Authority's offer to replace the original agreement with a management agreement that could be terminated in three-years and a consulting agreement which Landmark claims did not provide it with the same compensation as the original agreement.

Landmark alleges that the Authority came up with a scheme to resolve this dilemma: the parties would "orally link" the replacement agreements such that termination of the management agreement would automatically terminate the consulting agreement, which in turn would trigger the $8,000,000 buyout provision. Landmark alleges that the Authority's aversion to documenting the "linkage" of the replacement agreements stemmed from its fear of IRS scrutiny. Consequently, Landmark alleges that in a meeting at the Las Vegas airport the individual defendants orally agreed to "link" the replacement agreements as proposed.

Landmark now claims that the replacement agreements are null and void on the ground that the Authority failed to submit the consulting agreement and the "oral linkage" agreement for the approval of the Department of Interior as required under 25 U.S.C. §§ 81 and 85.[4] Hence, as noted above, Landmark seeks a declaration that the parties are bound by the terms of the original agreement, and $8,000,000 in compensatory damages from the individual defendants on the ground that they fraudulently induced Landmark to give up its rights under the original agreement.

---

**2.** The management and consulting agreements shall be referred to collectively as "the replacement agreements." The novation agreement merely reaffirmed that the original agreement was being replaced by the replacement agreement.

**3.** Landmark filed its original complaint on April 10, 1998.

**4.** As will be discussed herein, 25 U.S.C. §§ 81 and 85 govern contractual relationships with

Indians that relate to tribal property. Section 81 requires that contracts relating to tribal lands must be submitted for approval by the Secretary of the Interior and the Commissioner of Indian Affairs. Section 85 requires the consent of the United States for contracts relating to tribal funds or property. A violation of either section renders the contract void.

## DISCUSSION

Landmark contends it is not required to exhaust tribal remedies in the Las Vegas Paiute Tribal Court before seeking relief in federal court. Landmark advances three principal arguments in support of its position: (1) tribal courts do not have the power to adjudicate 25 U.S.C. § 81 claims; (2) the exhaustion rule does not apply because the claims at issue did not arise on tribal land; and (3) the "bad faith" exception to the exhaustion rule applies to this case.

 The exhaustion rule derives from the Supreme Court's holding in *National Farmers Union Ins. Cos. v. Crow Tribe of Indians,* 471 U.S. 845, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985). In that case, the Supreme Court held that, as a general rule, federal courts cannot consider any relief for a plaintiff in a civil action involving an Indian until available tribal remedies have been exhausted. *Id.* at 853–57, 105 S.Ct. at 2452–54. The exhaustion of tribal remedies means, at a minimum, "that tribal appellate courts must have the opportunity to review the determinations of the lower tribal courts." *Iowa Mut. Ins. Co. v. LaPlante,* 480 U.S. 9, 17, 107 S.Ct. 971, 977, 94 L.Ed.2d 10 (1987). The rule requires federal courts to allow tribal courts a full opportunity to determine the existence and extent of its own jurisdiction in the first instance, regardless of the basis of jurisdiction that may exist in federal court. *Id.* at 16, 107 S.Ct. at 976. Once remedies have been fully exhausted, a tribal court's determination of tribal jurisdiction presents a federal question and is therefore subject to consideration in federal court. *See Yellowstone County v. Pease,* 96 F.3d 1169, 1172 (9th Cir.1996), *cert. denied,* 520 U.S. 1209, 117 S.Ct. 1691, 137 L.Ed.2d 818 (1997).

 The exhaustion rule, however, is not unyielding. An exception to the rule exists "where an assertion of tribal jurisdiction 'is motivated by a desire to harass or is conducted in bad faith,' or where the action is patently violative of express jurisdictional prohibitions, or where exhaustion would be futile because of the lack of an adequate opportunity to challenge the court's jurisdiction." *National Farmers Union,* 471 U.S. at 856 n. 21, 105 S.Ct. at 2454 n. 21 (internal citation omitted). Where an exception to the exhaustion rule does not exist, however, a federal court is required to "dismiss or abstain from deciding cases in which concurrent jurisdiction in an Indian tribal court [is] asserted." *Crawford v. Genuine Parts Co.,* 947 F.2d 1405, 1407 (9th Cir.1991). This holds true irrespective of "[w]hether proceedings are actually pending in the appropriate tribal court" on the date on which a cause of action is filed in federal court. *Id.*

The exhaustion requirement is founded on the policies of promoting tribal self-government, self-determination, and the orderly administration of justice in federal court. *National Farmers Union,* 471 U.S. at 856–57, 105 S.Ct. at 2454. The Supreme Court has recognized that "Congress is committed to a policy of supporting tribal self-government and self-determination." *Id.* at 856, 105 S.Ct. 2447. "[P]roper respect for tribal legal institutions, [therefore], requires that they be given a 'full opportunity' to consider the issues before them ..." *LaPlante,* 480 U.S. at 16, 107 S.Ct. at 977 (quoting *National Farmers Union,* 471 U.S. at 857, 105 S.Ct. at 2454). If unconditional access to federal courts were allowed, tribal courts would be in direct competition with the federal forum, "thereby impairing the [tribal court's] authority over reservation affairs." *Id.* at 16, 107 S.Ct. at 976. Further, "the orderly administration of justice in the federal court will be served by allowing a full record to be developed in the Tribal Court before either the merits or any questions concerning appropriate relief is addressed." *National Farmers Union,* 471 U.S. at 856, 105 S.Ct. at 2454. Moreover, exhaustion "will encourage tribal courts to explain to the parties the precise basis for accepting jurisdiction" and therefore will "provide other courts with the benefit of their expertise in such

matters in the event of further judicial review." *Id.* at 857, 105 S.Ct. at 2454.

### A. 25 U.S.C. § 81

Landmark argues that it is not required to exhaust tribal remedies in this case because the Tribal Court cannot adjudicate claims under 25 U.S.C. § 81. Landmark advances three arguments in support of this claim: (1) there is no evidence that the Tribal Court has the power or expertise to adjudicate such claims; (2) the Tribe cannot adjudicate the extent of its own sovereignty; and (3) tribes are prevented from adjudicating such claims because of their status as inferior dependant sovereigns and because Congress intended that tribal jurisdiction be displaced under 25 U.S.C. § 81.

■■■] In light of the controlling precedent, Landmark's first and second arguments must fail. First, Landmark claims that exhaustion is not necessary because the Tribe's commercial court was only recently created and, therefore, lacks the expertise to hear Landmark's claims. The Supreme Court is clear on this issue. "The alleged incompetence of tribal courts is not among the exceptions to the exhaustion requirement ... and would be contrary to the congressional policy promoting the development of tribal courts." *LaPlante,* 480 U.S. at 19, 107 S.Ct. at 978 (internal citation omitted). Second, Landmark contends that exhaustion is not required in this case because the lawsuit involves claims that the Tribe and its Authority acted beyond their sovereign powers. Landmark cites *Tenneco Oil Co. v. Sac & Fox Tribe,* 725 F.2d 572 (10th Cir. 1984) for the proposition that tribes cannot adjudicate the extent of their own sovereignty. The Ninth Circuit, however, disagrees. "[B]oth the Supreme Court and this circuit have held that non-Indian defendants must exhaust tribal court remedies before seeking relief in federal court, even where defendants allege that proceedings in tribal court exceed tribal sovereign jurisdiction." *Burlington N.R.R. v. Crow Tribal Council,* 940 F.2d 1239, 1244 (9th Cir.1991) (court rejected claim by railroad that exhaustion was not required where it alleged that tribal ordinance exceeded the Tribe's sovereign powers) (citing *National Farmers Union,* 471 U.S. at 856–57, 105 S.Ct. at 2453–54; *LaPlante,* 480 U.S. at 16, 107 S.Ct. at 976).

Landmark also contends that an Indian tribe is precluded from adjudicating § 81 claims because of its status as a dependent sovereign and because Congress intended that federal interests protected by § 81 be enforced only in federal court. These claims, however, do not fit within the narrow exceptions to the exhaustion requirement.

■■ The presence of issues of federal law does not defeat the requirement that tribal remedies must be exhausted. *See Middlemist v. Secretary of U.S. Dept. of Interior,* 824 F.Supp. 940 (D.Mont.1993), *aff'd without opinion,* 19 F.3d 1318 (9th Cir.1994), *cert. denied,* 513 U.S. 961, 115 S.Ct. 420, 130 L.Ed.2d 335 (1994). The exhaustion requirement can only be defeated where a federal court finds that one of the three exceptions announced in *National Farmers Union* applies. *See LaPlante,* 480 U.S. at 18–19 n. 12, 107 S.Ct. at 978 n. 12. A claim that a federal statute deprives a tribal court of jurisdiction will fail unless it can be shown that the statute contains an express jurisdictional prohibition. *See United States v. Plainbull,* 957 F.2d 724, 726–28 (9th Cir.1992). Tribal courts, however, "rarely lose the first opportunity to determine jurisdiction because of an 'express jurisdictional prohibition.'" *Kerr–McGee Corp. v. Farley,* 115 F.3d 1498, 1502 (10th Cir.1997), *cert. denied,* — U.S. ——, 118 S.Ct. 880, 139 L.Ed.2d 868 (1998). Section 81 contains no such prohibition.

■■] Section 81 requires that contracts entered into with any tribe of Indians or individual Indians concerning Indian lands be submitted to the Secretary of the Interior for approval. Contracts that are made in violation of this section are declared void and an action can be brought to

obtain relief for the Indian who was a party to the contract. In this regard, § 81 reads:

All contracts or agreements made in violation of this section shall be null and void, and all money or other thing of value paid to any person by any Indian or tribe, or any one else, for or on his or their behalf, on account of such services, in excess of the amount approved by the Commissioner and Secretary for such services, may be recovered by suit in the name of the United States in any court of the United States, regardless of the amount in controversy; and one-half thereof shall be paid to the person suing for the same, and the other half shall be paid into the Treasury for the use of the Indian or tribe by or for whom it was so paid.

The plain language of § 81 does not expressly prohibit tribal court jurisdiction. Rather, § 81 merely provides to federal courts the authority to hear such claims. Nothing in that section limits the adjudication of such claims to the federal courts. Absent clear language prohibiting tribal court jurisdiction, a federal court must defer to the tribal court when concurrent jurisdiction is asserted. *See Plainbull,* 957 F.2d at 726–28.[5] Hence, deference to the Tribal Court is required unless this case falls within an exception to the exhaustion requirement.

## B. *Arising on Tribal Lands*

 Landmark argues that the exhaustion rule is inapplicable in this case because the claims at issue, the alleged misrepresentations made by tribal members at the Las Vegas airport, did not occur on the Tribe's land. Landmark contends that the exhaustion rule only applies where the claims at issue actually arise on tribal land. The Court disagrees. Deference to the Tribal Court is required in this case because the issue in dispute implicates "reservation affairs."

 Deference to tribal courts is required when the disputed issue " 'arise[s] on the reservation' " or involves a " *'reservation affair'* " and no exceptions to the exhaustion rule exist. *See Crawford,* 947 F.2d at 1407 (emphasis added). Where there is a colorable question as to whether the disputed issue actually involves a reservation affair or arises on the reservation, a federal court must defer to the tribal court to make the determination. *See Stock West Corp. v. Taylor,* 964 F.2d 912, 918–20 (9th Cir.1992). This is required where, based on the record, "the assertion of tribal court jurisdiction is *plausible and appears to have a valid or genuine basis." Id.* at 919 (emphasis added).

This case implicates reservation affairs. The defendants in this case are Native Americans. The focus of this case are contracts Landmark entered into with the Tribe to be performed on the reservation. The issues Landmark ultimately seeks to resolve in this case are (1) whether the Tribe must honor a contract calling for Landmark to manage facilities on the Tribe's land for the next thirty years, and (2) whether certain tribal members are required to pay Landmark $8,000,000 in damages. That the alleged misrepresentations may have occurred off the physical boundaries of the reservation in no way undermines the inescapable conclusion that a decision on the merits of this case will have a direct impact on the property interests and future economic activity of the Tribe. "[T]ribal courts have repeated-

5. Landmark's First Amended Complaint also asserts a cause of action under 25 U.S.C. § 85. That section provides: "No contract made with any Indian, where such contract relates to the tribal funds or property in the hands of the United States, shall be valid, nor shall any payment for services rendered in relation thereto be made unless the consent of the United States has previously been given."

Landmark, although relying primarily on § 81, contends that § 85 also deprives the Tribal Court of jurisdiction for the same reasons argued above. As discussed above, however, tribal remedies must be exhausted absent an express jurisdiction prohibition. *See Plainbull,* 957 F.2d at 726–28. The plain language of § 85 contains no such prohibition.

ly been recognized as appropriate forums for the exclusive adjudication of disputes affecting important personal and property rights of both Indians and non-Indians." *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 65, 98 S.Ct. 1670, 1680–81, 56 L.Ed.2d 106 (1978). Because the issues in this case affect the Tribe's property interests, the Court concludes that "reservation affairs" are implicated. In any event, whether "reservation affairs" are implicated presents a colorable question that must be first decided by the Tribal Court. *Stock West Corp.,* 964 F.2d at 918–20.

### C. Bad Faith Exception

▇▇ Landmark argues that exhaustion is not required under *National Farmers Union* because the Las Vegas Paiute Tribal Court's assertion of jurisdiction over this case would involve bad faith. In support of its claim, Landmark alleges that every Tribal Court judge and juror who might sit on this case would have a vested financial interest in its outcome. Landmark contends that the Tribe cannot be expected to fairly adjudicate the propriety of its own conduct. An allegation of Tribal Court bias, however, does not fit within the bad faith exception to the exhaustion requirement. *See A & A Concrete, Inc. v. White Mountain Apache Tribe,* 781 F.2d 1411, 1416–1417 (9th Cir.1986), *cert. denied,* 476 U.S. 1117, 106 S.Ct. 2008, 90 L.Ed.2d 659 (1986).

In *White Mountain Apache Tribe,* the court refused to find an exception to the exhaustion requirement where plaintiffs alleged that the chief judge of the tribal court would be biased against them because of the judge's connection to the tribal council. The court held that the plaintiffs' failure to raise this claim in tribal court and exhaust available remedies precluded them from raising the issue in federal court. *Id.* Landmark's allegations of bias, therefore, must be asserted in the first instance in the Las Vegas Paiute Tribal·Court.[6]

The bad faith exception to the exhaustion requirement does not apply unless the record contains proof of bad faith or a motive to harass. *Id.* at 1417; *Adams v. Moapa Band of Paiute Indians,* 991 F.Supp. 1218, 1221 (D.Nev., 1997). The record in this case does not support Landmark's allegation that the tribal court's assertion of jurisdiction over this case would be made in bad faith.

Having found no exceptions to the exhaustion requirement, this Court must defer to the Tribal Court so it can determine the existence and extent of its own jurisdiction in the first instance *White Mountain Apache Tribe,* 781 F.2d at 1418. " 'Once all tribal remedies are exhausted and the tribal courts finally decide that tribal jurisdiction exists, then the district court can decide the question of tribal jurisdiction.' " *Pease,* 96 F.3d at 1172 (quoting *Stock West, Inc. v. Confederated Tribes of the Colville Reservation,* 873 F.2d 1221, 1227 (9th Cir.1989)).

### RECOMMENDATION

Based on the foregoing, it is the recommendation of the undersigned United States Magistrate Judge that plaintiff's Motion to Dismiss (#21) should be granted.

March 4, 1999.

---

**6.** At oral argument, counsel for the defendants stated that David Rivers, a local attorney and non-member of the Tribe, was appointed as the commercial court judge who would preside over this action. It appears, therefore, that Landmark's allegation of judicial bias is unfounded.