| SELECTION PROCESS STEPS | A 1975 | | | B 1977 | | | C^a 1975 ADDED to 1977 | | | D 1975 or 1977 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | M | F | T | M | F | T | M | F | T | M | F | T |
| Deputy I,II,III,IV | (1974) 3479 | 364 | 3843^d | (1976) 3596 | 477 | 4073^e | (1975) 3619 | 415 | 4034^f | - | - | - |
| Applied | 1506 | 101 | 1607 | 1628 | 141 | 1769 | 3134 | 242 | 3376 | 2159 | 190 | 2349 |
| Did Not Promote Early | - | - | - | 1616 | 141 | 1757^c | 3122 | 242 | 3364 | - | - | - |
| Took Written Test | 1312 | 79 | 1391 | 1259 | 102 | 1361 | 2571 | 181 | 2752 | 1826 | 145 | 1971 |
| Took Written Test Not Promoted Early | - | - | - | 1254 | 102 | 1356 | 2566 | 181 | 2747 | | | |
| Passed Cutoff for Written Test (70% 1975)(70% 1977) | 491 | 19 | 510 | 562 | 34 | 596 | 1053 | 53 | 1106 | 849 | 40 | 897 |
| Passed Cutoff for Written and Not Promoted Early | - | - | - | 558 | 34 | 592 | 1049 | 53 | 1102 | | | |
| Appraisal of Promotability Made (AP) | 487 | 19 | 506 | 558 | 34 | 592 | 1045 | 53 | 1098 | 846 | 48 | 894 |
| Passed Cutoff of AP and Written (53.78 1975)(53.75 1977) | 250 | 10 | 260 | 331 | 18 | 349 | 581 | 28 | 609 | 502 | 24 | 526 |
| Took Oral Interview | 250 | 10 | 260 | 329 | 18 | 347 | 579 | 28 | 607 | 513 | 28 | 541 |
| Placed on Eligible List | 249 | 10 | 259 | 331^g | 18 | 349 | 580 | 28 | 608 | 514 | 28 | 542 |
| Promoted | 127 | 4 | 131 | 93 | 5 | 98 | 220 | 9 | 229 | 220 | 9 | 229 |

NOTES: See attached.

**BURLINGTON NORTHERN RAILROAD COMPANY, Plaintiff–Appellee,**

v.

**CROW TRIBAL COUNCIL, et al., Defendants–Appellants.**

No. 89–35667.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 8, 1990.

Decided July 26, 1991.

Thomas E. Towe, (argued), Billings, Mont. (Sarah W. Barlow and Daniel M. Rosenfelt, Rosenfelt, Barlow & Borg, P.A., Albuquerque, N.M., on brief) for defendants-appellants.

Michael E. Webster, Crowley, Haughey, Hanson, Toole & Dietrich, Billings, Mont., for plaintiff-appellee.

Before TANG, D.W. NELSON and CANBY, Circuit Judges.

TANG, Circuit Judge:

The Crow Tribe enacted an ordinance establishing a commission to regulate railroads crossing the Crow Reservation. Burlington Northern Railroad ("BN") sought a declaratory judgment in federal court invalidating the ordinance as exceeding tribal jurisdiction. The Tribe moved for dismissal for lack of jurisdiction, and the district court denied the motion. The district court later granted default judgment to BN for the Tribe's failure to comply with an order compelling the Tribe's answers to discovery. The Tribe appeals. We vacate judgment and remand.

## FACTUAL AND PROCEDURAL BACKGROUND

BN operates the only railroad line across the Crow Reservation, located in southeastern Montana. An 1889 Act of Congress established BN's right-of-way across the Reservation. 25 Stat. 660 (1889). Until 1986, BN maintained a freight station at Lodge Grass on the reservation, but it did not provide passenger service. In October

1982, the Crow Tribal Council adopted Resolution 83–6, thereby enacting the Crow Tribal Common Carrier Ordinance, a regulatory ordinance patterned after Montana statutes. The ordinance establishes "general duties" for common carriers operating on the Crow Reservation and a tribal regulatory commission.

Specifically, the ordinance by its terms applies to all "common carriers" or "railroad lines." Crow Trib.Ord. § 4A. It empowers the Commission to investigate and hold hearings on violations of tribal law, to enforce health and safety regulations in conformity with federal law, and to prosecute violations of state and federal law. Crow.Trib.Ord. §§ 7A, 8A, 9A, 11A. The ordinance further empowers the Commission "to compel ... railroads subject hereto to provide ... sufficient train service, both freight and passenger," and "to provide ... suitable waiting rooms for passengers and suitable rooms for freight and baggage at all stations." Crow.Trib.Ord. § 10A. Next, the ordinance promulgates "Requirements for Railroads," including (1) providing regular service, (2) providing "sufficient accommodations," and (3) maintaining freight and passenger facilities. Crow Trib.Ord. §§ 2A, 2B(1). The ordinance further states that no carrier may discontinue use of any current railroad facility without a hearing before the Commission. Crow Trib.Ord. § 2B(2). The ordinance does, however, provide for exemption from the ordinance upon written request and a hearing. Crow Trib.Ord. § 14A. Finally, the ordinance declares that railroad service "is vitally important to the long term development of the Crow Tribe's economic base." Crow Trib.Ord. § 2A.

Apparently the Commission did not act for three years after its creation. In December 1985 the Commission wrote to BN's vice president enclosing a copy of the ordinance and "requesting a meeting ... concerning complaints of non-compliance with the agreement with Burlington Northern Railway and the Crow Tribe." BN did not respond to the Commission's request for a meeting. Two months later, in March 1986, BN filed a complaint in federal district court seeking a declaratory judgment

that the ordinance is null and void because it exceeds tribal sovereign power.

In April 1986, the Crow Tribe's attorney, N. Jean Bearcrane, filed a motion to dismiss for lack of jurisdiction. The Tribe argued that BN's complaint failed to allege a controversy ripe for adjudication, that BN lacked standing, that BN failed to exhaust tribal remedies, and that the Tribe's sovereign immunity deprived the court of jurisdiction. The district court denied the motion in January 1987.

In February 1987, the Tribe moved for a preliminary injunction to prevent BN from closing its Lodge Grass railroad station, the only station on the Crow Reservation. The Tribe based its motion on the provision of the disputed ordinance requiring maintenance of rail stations, among other facilities, unless exempted from this duty by the Commission. Crow Trib.Ord. § 2B. The district court never ruled on this motion, and BN closed the station.

The Crow Tribe may not retain counsel, generally, without the written approval of the Bureau of Indian Affairs ("BIA"). 25 U.S.C. § 81. On January 9, 1988, the Crow Tribal Council resolved to renew its contract with Bearcrane and Attorney Daniel Rosenfelt. On January 29, 1988, BN mailed its Second Set of Interrogatories and First Requests for Production to Bearcrane. The BIA rejected the Crow resolution to contract with Bearcrane and Rosenfelt on February 17. On March 10, Crow Tribal Chairman Richard Real Bird submitted a proposed contract with Attorney Harold G. Stanton to the BIA. In response to the BIA's objections, Stanton resubmitted a revised contract on March 23. In the meantime, the Tribe could not retain legal counsel and it did not respond to BN's discovery requests.

On March 30, 1988, Bearcrane wrote to the district court stating that her contract with the Tribe had expired and she was therefore no longer authorized to represent the Tribe. The BIA verified the expiration of counsel's contract by letter to the court on April 4. At a preliminary pretrial conference the next day, no representative of

the Tribe appeared. The district court ordered the conference postponed to May 3. In its order, the district court reminded "defendants [Crow Tribal Council] and their counsel of the availability of sanctions" for failure to appear. The court also reminded defendant Crow Tribal Council of the local rule requiring counsel to obtain the court's leave to withdraw as counsel of record. Both Bearcrane and Stanton appeared at the May 3 conference, though both disavowed authority to represent the Tribe.

On June 15, the BIA again disapproved the Tribe's proposed attorney contract. At its July Council meeting, the Tribe passed a new attorney contract resolution. On September 7, 1988, the BIA disapproved that proposed contract. Also in September, the Tribe failed to file a status report required by the court's scheduling order. The Tribe also continued to fail to respond to BN's discovery requests. On October 8, 1988, the Tribal Council again resolved to retain counsel. On October 11, BN moved for an order compelling the Tribe's response to the discovery BN had filed in January. On November 4, the BIA disapproved the latest proposed attorney contract. On November 10, the district court granted BN's motion to compel.

Attorney Stanton wrote to the district court on November 14, 1988, apprising the court of the Tribe's inability to retain counsel. On November 22, the district court wrote to Stanton stating Bearcrane was still the Tribe's counsel of record and that it had received no request for a stay or continuance.[1] At the next Tribal Council meeting, in January 1989, the Tribal Council approved a new contract. On February 14, BN moved for a default judgment for the Tribe's failure to comply with the court's order compelling discovery. On February 16, over a year after submission of the first attorney contract from the

Tribe, the BIA approved the latest attorney contract. Since then, counsel retained under the contract has defended the Tribe. On August 11, 1989, the court entered a default judgment for BN from which the Tribe appeals.

### DISCUSSION

The Tribe's appeal raises several meritorious objections to the district court's assumption of jurisdiction and entry of judgment in this case. We address the issues of federal jurisdiction, exhaustion of tribal remedies, and default judgment in turn, but we focus on the exhaustion issue.

### I. *Federal Court Jurisdiction*

■ We review de novo a district court's determination of federal subject matter jurisdiction. *Stock West, Inc. v. Confederated Tribes of the Colville Reservation*, 873 F.2d 1221, 1225 (9th Cir.1989). We accept a district court's fact findings on jurisdictional issues unless clearly erroneous. *Id.*

The Tribe argues that BN's complaint failed to show standing and ripeness for federal court jurisdiction. The Tribe also contends that, even if BN's complaint evinced standing and ripeness, the controversy became moot when BN closed its Grass Lodge Station.

Despite the jurisdictional nature of these issues, we are reluctant to decide them in view of two related considerations. First, facts relevant to determining ripeness and mootness will vary with time. *Cf.* 13A C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3532.1, at 130 (2d ed. 1984) ("ripeness and mootness ... could be addressed as ... the time dimensions of standing"). Second, if BN must exhaust tribal remedies before proceeding in federal court, events occurring during the passage of time could well effect the outcome of jurisdictional issues. We therefore will consider the Tribe's jurisdictional

---

1. The Tribe moved this court to supplement the addendum to its brief to include (1) the district court's November 22, 1988 letter, and (2) an affidavit of a BIA official submitted in *Crow Tribe of Indians v. Whitesell*, No. CV 89–191–BLG–JFB, (D.Mont.), a suit concerning BIA disapproval of tribal attorney contracts. BN responded with a motion to strike both items and all references to those items as not part of the record. Disposition of this case requires neither item. We may freely consider the district court's letter in all events, however, for the district court was certainly aware of its own correspondence when ruling below.

challenges only insofar as they might prevent us from reaching the exhaustion issue. We believe this to be the prudent course, as it will allow us to decide the appeal on grounds that partake of the nature of a jurisdictional bar (i.e., exhaustion of tribal remedies) while avoiding—at least for the time being—jurisdictional issues of constitutional dimension (i.e., ripeness and mootness). We recognize, however, that this course may not be appropriate in all cases. *See id.* at 125 (In the context of abstaining in favor of a state court, "[m]arginally ripe cases should not be found justiciable simply because decision can be avoided during [exhaustion].").

### A. Standing and Ripeness

■ The Tribe contends that BN's complaint fails to allege an injury sufficient to establish the jurisdictional prerequisites of standing and ripeness. To allege an actual controversy within federal court jurisdiction under the Declaratory Judgment Act, 28 U.S.C. § 2201, BN's complaint must have alleged facts showing standing and ripeness. To show standing, BN must have alleged "some threatened or actual injury resulting from" the challenged ordinance. *Linda R.S. v. Richard D.*, 410 U.S. 614, 617, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973). To show ripeness, BN must have alleged an "impact" from the ordinance "sufficiently direct and immediate as to render the issue appropriate for judicial review at this stage." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 152, 87 S.Ct. 1507, 1517, 18 L.Ed.2d 681 (1967). The standing and ripeness of BN's complaint thus depend on the sufficiency of BN's allegations of threatened or actual injury or direct and immediate impact resulting from the Crow Tribal Ordinance.

If the complaint alleges a ripe controversy, we have little difficulty concluding that BN has shown standing. BN is clearly subject to the terms of the ordinance; indeed, it appears that BN may be the *only* entity subject to the ordinance. Thus, BN

is clearly "a proper party to maintain the action." *Flast v. Cohen*, 392 U.S. 83, 100, 88 S.Ct. 1942, 1953, 20 L.Ed.2d 947 (1968).

■ Ripeness presents a closer question. Mere passage of the ordinance, with a potential for enforcement against BN, is not sufficient to make the controversy ripe. *See Del Percio v. Thornsley*, 877 F.2d 785, 786–87 (9th Cir.1989). Here, however, there is more. The members of the Tribal Commission sent a letter to BN citing the resolution establishing the Commission. A copy of the letter was appended as an exhibit to the complaint. The letter stated that, "per enclosed Crow Tribal Resolution 83–6," the Commission members were "requesting a meeting with [BN] representatives concerning complaints of non-compliance with the agreement with Burlington Northern Railway and the Crow Tribe." The letter further indicated that an "immediate response will be greatly appreciated." When viewed in the context of an ordinance intended to apply only to one entity, we conclude that BN's complaint detailed an exercise of authority by the Commission over BN sufficient to allow a federal court to consider the requirement that BN exhaust tribal remedies.[2]

### B. Mootness

■ During the pendency of this case, BN obtained approval from Montana regulatory authorities to close its only station located on the Reservation, its Lodge Grass Station. The district court never ruled on the Tribe's motion for a preliminary injunction preventing the closure, and BN closed the station. The Tribe contends that the only sections of the ordinance arguably ripe for federal court adjudication are those requiring railroads to provide sufficient railroad facilities and requiring a hearing before the Commission prior to closure. *See* Crow Trib.Ord. §§ 10A, 2B. The closure of the only BN facility on the Reservation, the Tribe contends, moots this arguably ripe issue.

---

**2.** That the threatened enforcement of the Tribe's ordinance is not merely hypothetical is further shown by the Tribe's attempt to obtain an injunction preventing BN from closing the Grass Lodge Station.

A case becomes moot when a court cannot grant effective relief, *United States v. Oregon*, 718 F.2d 299, 302 (9th Cir.1983), and where it is unlikely that the precise conditions of the case could ever recur, *Lee v. Schmidt–Wenzel*, 766 F.2d 1387, 1390 (9th Cir.1985). If the only issue ripe for review were the maintenance of BN facilities on the Reservation, then closure of the only facility might moot that issue. It would be futile to decide whether the Commission had jurisdiction over a *fait accompli* closure no longer challenged by the Tribe, and so no effective relief would remain possible. The ordinance with which we are concerned, however, involves more than the maintenance of existing facilities. For example, section 10A empowers the Crow Commission "to compel ... railroads subject hereto to provide ... sufficient train service, both freight and passenger," and "to provide ... suitable waiting rooms for passengers and suitable rooms for freight and baggage at all stations." The closure of one station when BN may be compelled to open others does not moot the case in a manner preventing consideration of the exhaustion requirement.

II. *Exhaustion of Tribal Remedies*

■ The Tribe argues that the district court should have dismissed BN's complaint or stayed proceedings until BN had exhausted tribal remedies. BN's allegation that the ordinance exceeds the Tribe's sovereign powers presents an undisputed "federal question" for subject matter jurisdiction in federal court. *See National Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 845, 851–53, 105 S.Ct. 2447, 2451–52, 85 L.Ed.2d 818 (1985); *Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1077 (9th Cir.1990) ("In attempting to enforce its ordinance against ... a non-Indian, the Band necessarily invokes its sovereign power and relies on its disputed ability, under principles of federal common law, to apply that power against one outside of its own community.... The federal question of the Band's power inheres in its complaint."). Nonetheless, both the Supreme Court and this circuit have held that non-Indian defendants *must exhaust tribal*

*court remedies* before seeking relief in federal court, even where defendants allege that proceedings in tribal court exceed tribal sovereign jurisdiction. *See National Farmers Union*, 471 U.S. at 856–57, 105 S.Ct. at 2453–54; *Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 16, 107 S.Ct. 971, 976, 94 L.Ed.2d 10 (1987); *Stock West, Inc. v. Confederated Tribes of the Colville Reservation*, 873 F.2d 1221 (9th Cir.1989).

In *Stock West* we affirmed the district court's dismissal of a non-Indian's suit for an injunction enjoining tribal court proceedings against it. We also reiterated the rule that "civil jurisdiction over the activities of non-Indians on reservation lands 'presumptively lies in the tribal courts unless affirmatively limited by a specific treaty provision or federal statute.'" *Id.* at 1228 (quoting *LaPlante*, 480 U.S. at 18, 107 S.Ct. at 977).

BN does not dispute Crow tribal jurisdiction to hear the challenge BN brought in federal court. Indeed, concurrent jurisdiction may lie in the federal and tribal forums in this case. Rather, BN argues that the district court did not "abuse its discretion" in refusing to force BN to exhaust tribal remedies before proceeding in federal court. In framing this issue, BN misplaces reliance on our decision in *Stock West. Id.* at 1229.

A. The Application of *Stock West*

■ In *Stock West*, we said an abuse of discretion standard of review applies to a district court's decision to abstain where jurisdiction lies concurrently in tribal and federal courts. *Id.* We stressed, however, that the initial determination of whether the Tribe has jurisdiction lies with the tribal court alone. *Id.* at 1227. Under the Supreme Court's ruling in *National Farmers Union*, "the federal courts should *not even make a ruling on tribal court jurisdiction* ... until tribal remedies are exhausted." *Id.* at 1228 (emphasis added).

We therefore concluded in *Stock West* that we could affirm dismissal of the non-Indian's federal court complaint solely on the basis of the non-Indian's failure to pursue tribal court adjudication of tribal court

jurisdiction. *Id.* Indeed, we reached the abstention issue under an abuse of discretion standard in *Stock West* only by assuming that a tribal court had already determined that jurisdiction was concurrent in federal and tribal courts. *Id.* [3] In BN's case, no tribal authority had determined its own jurisdiction before BN sought relief in federal court.

Moreover, the abuse of discretion standard arose in *Stock West* in our review of the district court's decision to dismiss rather than to stay a suit where we assumed jurisdiction was concurrent in federal and tribal courts. *Id.* at 1229. In *National Farmers Union,* the Supreme Court stated that "[w]hether the federal action should be dismissed, or merely held in abeyance ... is a question that should be addressed in the first instance by the District Court." *National Farmers Union,* 471 U.S. at 857, 105 S.Ct. at 2454. The *National Farmers Union* Court thus indicated that a district court may exercise discretion in choosing between a stay of proceedings or dismissal pending exhaustion of tribal remedies. We review an exercise of such discretion, of course, for abuse. BN misapplies a standard of review appropriate for a district court's choice between a stay and dismissal, however, to the underlying prerequisite of exhaustion of tribal remedies. The requirement of exhaustion of tribal remedies is not discretionary; it is mandatory. The district court had no discretion to relieve BN from exhausting tribal remedies prior to proceeding in federal court.

### B. The Application of the Exhaustion Requirement

The Supreme Court has mandated the exhaustion of tribal remedies as a prerequisite to a federal court's exercise of its jurisdiction: "[E]xhaustion *is required* before such a claim may be entertained by a federal court." *National Farmers Union,*

471 U.S. at 857, 105 S.Ct. at 2454 (emphasis added). In *Iowa Mutual Ins. v. LaPlante,* the Supreme Court said that "federal policy ... *directs* a federal court to stay its hand," and "proper respect ... *requires*" tribal remedy exhaustion. 480 U.S. at 16, 107 S.Ct. at 976 (emphasis added). Therefore, non-Indian petitioners "*must* exhaust available tribal remedies." *Id.* The *LaPlante* Court emphasized that "*National Farmers Union requires* that the issue of jurisdiction be resolved by the Tribal courts in the first instance." *Id.* (emphasis added). The Supreme Court's mandate of exhaustion of tribal court remedies as a prerequisite to a federal court's exercise of its jurisdiction applies squarely to this case. Accordingly, we hold that BN was required to exhaust tribal remedies before the district court could take action on the complaint.

Three imperatives arising from the nature of tribal sovereignty compel the requirement of exhaustion of tribal remedies. *See National Farmers Union,* 471 U.S. at 856–57, 105 S.Ct. at 2453–54. First, as the Supreme Court recognized, "Congress is committed to a policy of supporting tribal self-government and self-determination." *Id.* at 856, 105 S.Ct. at 2454. "That policy," the Supreme Court said, "favors a rule that will provide the forum whose jurisdiction is being challenged the first opportunity to evaluate the factual and legal bases for the challenge." *Id.*

The policy of tribal self-government and self-determination goes to the heart of this case. Through the challenged ordinance, the Tribe reasserts its commitment to sovereign authority over Reservation affairs. The ordinance establishes governmental mechanisms for exercise of that authority. Moreover, the ordinance identifies railroad services as vital to the Tribe's economic development. The foundation of self-determination for the Tribe must be its growing

---

3. In *Burlington Northern R.R. v. The Blackfeet Tribe,* 924 F.2d 899, 901 n. 2 (9th Cir.1991), we recently revisited the abuse of discretion standard of review employed in *Stock West,* stating that "failure to exhaust is not a bar to [federal] jurisdiction." Indeed, the exhaustion requirement is not a jurisdictional bar. Federal courts may merely stay proceedings and retain jurisdiction pending exhaustion of tribal court remedies. *National Farmers Union,* 471 U.S. at 857, 105 S.Ct. at 2454. The exhaustion requirement thus functions as a prerequisite to a federal court's exercise of its jurisdiction.

economic independence. Thus arises the necessity for BN's exhaustion of tribal remedies: the Crow Tribe must itself first interpret its own ordinance and define its own jurisdiction.

The practical imperative of judicial efficiency also compels exhaustion of tribal remedies. As the Supreme Court has recognized, "the orderly administration of justice in the federal court will be served by allowing a full record to be developed in the Tribal Court before either the merits or any question concerning appropriate relief is addressed." *National Farmers Union,* 471 U.S. at 856, 105 S.Ct. at 2454. Exhaustion thus encourages more efficient procedures. This policy also compels exhaustion of tribal remedies before BN resorts to federal district court. Here the Tribe itself is in the best position to develop the necessary factual record for disposition on the merits. Without that tribal record, the federal district court here faced an action based on an uninterpreted tribal ordinance and an obscure factual background.

Finally, the Supreme Court has recognized that "[e]xhaustion of tribal court remedies ... will encourage tribal courts to explain to the parties the precise basis for accepting jurisdiction, and will also provide other courts with the benefit of their expertise in such matters in the event of further judicial review." *Id.* at 857, 105 S.Ct. at 2454. Here also, the district court labored without benefit of tribal explanations and expertise. All three imperatives for exhaustion, therefore, compel dismissing or staying federal court proceedings in BN's case.

## C. The Scope of the Exhaustion Requirement

BN seeks to distinguish its case as outside the scope of the exhaustion precedents in two ways. First, BN points out, in the Supreme Court precedents and *Stock West,* Indians sued non-Indians in tribal court first. Unlike BN, therefore, those non-Indian defendants sought relief in federal court from ongoing tribal court proceedings. BN, on the other hand, sought a declaration of sovereign authority before it

was ever prosecuted in Crow Tribal Court or otherwise subjected to Crow tribal authority.

This distinction falls of its own weight. If the exercise of Crow sovereign authority over BN was so slight as to distinguish it from precedents where non-Indians complained of the exercise of tribal authority, then BN cannot assert a ripe claim in federal court in all events. If, on the other hand, BN suffers from a justiciable imposition of Crow sovereign authority, then its position is substantively no different from the non-Indian defendants forced to exhaust tribal remedies before seeking relief in federal court.

Second, BN argues, the non-Indian defendants in the Supreme Court cases and *Stock West* sought relief from tribal judicial proceedings, while BN seeks relief from Crow tribal administrative proceedings under the disputed ordinance. Again, the distinction is not substantive. Crow tribal law provides at least two avenues of remedy for BN to exhaust before invoking federal court power. The ordinance itself authorizes the Commission to hear applications for exemption from the ordinance. Crow Trib.Ord. § 14A. Had the district court insisted that BN invoke this process first, the Commission would have had the first opportunity to interpret the ordinance and rule on its own jurisdiction.

As in *National Farmers Union,* an initial exercise of tribal jurisdiction not only would bolster tribal self-government, but also would provide any subsequently reviewing federal court with authoritative interpretation of the ordinance. 471 U.S. at 856–57, 105 S.Ct. at 2453–54; *see also Stock West,* 873 F.2d at 1228. Had the federal district court proceeded further in this case, on the other hand, it would have interpreted the disputed ordinance and ruled on tribal jurisdiction before tribal authorities themselves had a chance to declare what tribal law means. The same policies supporting dismissal or staying of federal proceedings in the Supreme Court cases and *Stock West* thus dictate dismissal or a stay here, even though in this case

administrative rather than judicial remedies are at issue.

Moreover, the ordinance specifies a remedy of judicial review of Commission administrative proceedings in both federal and Crow tribal courts. Crow Trib.Ord. § 14A. Were BN dissatisfied with the Commission's interpretation of its own jurisdiction, Crow Tribal Court yet offered a further avenue of tribal remedies for BN to exhaust. Because tribal judicial review of the administrative action was available, this case does not differ significantly from the Supreme Court and *Stock West* precedents. Again, Crow Tribal Court ought to have had the opportunity to interpret tribal law and decide the scope of tribal jurisdiction before BN could resort to federal court.

We therefore vacate the district court's judgment and remand for dismissal or a stay. BN must exhaust Crow tribal remedies, both administrative and judicial, before federal court adjudication of the railroad's claims may proceed.

### III. *Default Judgment as a Discovery Sanction*

Because we vacate the district court's judgment against the Tribe and remand for dismissal or a stay of BN's complaint, we do not reach the merits of default judgment as a discovery sanction in this case.[4] The district court erred in not granting a dismissal or stay well before any proceedings, including discovery, ensued.

### CONCLUSION

The district court erred in failing to dismiss or stay federal proceedings pending BN's exhaustion of Crow tribal administrative remedies. We therefore vacate judgment for BN and remand for dismissal or a stay of BN's suit.

VACATED AND REMANDED FOR DISMISSAL OR STAY.

---

4. Proper respect for the parties and district court in this case compels some observations in passing. There is no doubt that the district court impermissibly attributed to the Tribe willful noncompliance, unsubstantiated in the record, in the Tribe's failure to retain counsel and comply with district court orders. We also note the district court's understandable impatience with the Tribe's seeming defiance of federal jurisdiction. Default judgment probably was not warranted, however, as a sanction in this case. *See Halaco Eng'g v. Costle,* 843 F.2d 376, 380–82 (9th Cir.1988) (default judgment as a sanction is improper absent several factors). Even uncounselled, however, the Tribe was obligated to respond in some way to the discovery and other pretrial proceedings validly ordered by the district court.