# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

———————

No. 01-3040

———————

| | | |
|---|---|---|
| Gaming World International, Ltd., a Delaware Corporation, | * * * | |
| Petitioner - Appellee, | * * | Appeal from the United States District Court for the |
| v. | * * | District of Minnesota. |
| White Earth Band of Chippewa Indians; White Earth Reservation Business Committee, also known as White Earth Tribal Council, doing business as Shooting Star Casino, | * * * * * * * | |
| Respondent - Appellant. | * | |

———————

Submitted: May 16, 2002
Filed: January 24, 2003

———————

Before LOKEN, HEANEY, and MURPHY, Circuit Judges.

———————

MURPHY, Circuit Judge.

This case grows out of a dispute between the White Earth Band of Chippewa Indians (the Band) and Gaming World International, Ltd. (Gaming World) related to the construction and management of a casino in Mahnomen, Minnesota. Approximately one month after the Band filed a declaratory judgment action against Gaming World in the White Earth Band of Chippewa Tribal Court, Gaming World

filed this petition seeking declaratory relief and arbitration. The district court granted Gaming World's motion to compel arbitration, and the Band appeals. We affirm in part and reverse in part.

I.

Gaming World is a Delaware corporation that specializes in operating casinos, and the Band is a federally recognized Indian tribe. The Band is governed by the White Earth Tribal Council which has conducted business as the White Earth Reservation Business Committee. In 1991 the parties agreed that the Band would construct the Shooting Star Casino in Mahnomen, Minnesota and that Gaming World would help to finance and manage it. A written contract was drafted which provided for a term of seven years and a division of the net profits of the casino. Sixty percent of the net profits were to go to the Band and forty percent to Gaming World. Appellant's Appendix (App.) at A-363. The White Earth Reservation Business Committee signed on behalf of the Band.

The parties agreed that the Band would borrow funds to finance the construction of the casino and that the loans would be repaid out of the Band's share of net profits. Id. at A-32, 245. The Band obtained the necessary construction funds by drawing $11,800,000 from a trust fund established under the White Earth Land Settlement Act (WELSA), 25 U.S.C. § 331, and by arranging a $5,500,000 commercial loan. App. at A-43, 245. The casino was furnished through a $5,000,000 contribution by Gaming World, apparently to be reimbursed from casino gross revenues. Id. at A-44, 249.

Casino management contracts involving Indian tribes are regulated under the Indian Gaming Regulatory Act of 1988 (IGRA). 25 U.S.C. §§ 2701 et seq. IGRA created the National Indian Gaming Commission (NIGC), 25 U.S.C. § 2704, and assigned responsibility for reviewing all management contracts to the Chairman of

-2-

NIGC. 25 U.S.C. §§ 2710(d)(9) & 2711. Although IGRA was passed in 1988, it was only in February 1993 that NIGC began to function. Before that time the Secretary of the Interior had interim authority to review and approve management contracts. See 25 U.S.C. § 2709. The Secretary delegated his own approval power under IGRA to the Area Directors of the Bureau of Indian Affairs (BIA), whose decisions could be appealed to the Interior Board of Indian Appeals (IBIA). 25 C.F.R. § 2.4(e). An Area Director's decision automatically became effective after thirty days, unless an adversely affected party had filed both a notice of appeal and a petition for a stay. 43 C.F.R. § 4.21(a)(2). During the interim before NIGC became operational, only IBIA could grant final approval of management agreements on behalf of the Secretary. 43 C.F.R.§§ 4.1(b)(2), 4.312. An unreviewed decision by an Area Director was not a final agency decision for purposes of exhaustion and judicial review. 43 C.F.R. §§ 4.21(c), 4.314(a).

IGRA specifies that the Chairman of NIGC has exclusive authority to approve any casino management contract, 25 U.S.C. § 2705(a)(4); 25 C.F.R. § 533.1(b), and every management contract must contain a provision acknowledging this fact. 25 C.F.R. § 531.1(n). Contracts approved under the Secretary's interim authority were to be effective only "until approved or disapproved by the Chairman." 25 C.F.R. § 533.1(c). Management contracts "that have not been approved by the Secretary of the Interior or the Chairman...are void." 25 C.F.R. § 533.7; see also 25 U.S.C. § 2711(a)(1) (management contracts subject to approval of chairman). After NIGC became operational in February 1993, only its chairman could grant final approval to a management contract under the regulatory scheme created under IGRA. 25 U.S.C. § 2705(a)(4); 25 C.F.R. § 533.1(a)-(b).

IGRA contains provisions governing the maximum term for management agreements, division of profits under them, and limitations on repayment of construction costs. See 25 U.S.C. § 2711(b)-(c). Although the statute limits management contract terms to five years, it authorizes approval of terms up to seven

years if necessary because of the amount of capital investment, income projections, and type of gaming involved. 25 U.S.C. § 2711(b)(5). Similarly, management fees are not to exceed thirty percent of net revenues, but they may go as high as forty percent if approved and if circumstances require. 25 U.S.C. § 2711(c). Every management contract is also required to provide "a minimum guaranteed payment to the Indian tribe that has preference over the retirement of development and construction costs," 25 U.S.C. § 2711(b)(3), and "for an agreed ceiling for the repayment of development and construction costs." 25 U.S.C. § 2711(b)(4).

Because the Band and Gaming World drafted their initial agreement before NIGC was actually in operation, they submitted it to the Area Director of the BIA for approval. The Area Director decided that the contract could not be approved unless modified to decrease its term to five years, to reallocate profits seventy percent to the Band and thirty percent to Gaming World, and to repay all of the Band's borrowed construction funds from gross casino revenues rather than from the Band's share of net profits. The parties agreed to these conditions under protest, and the Area Director approved the contract as so modified on March 6, 1992. App. at A-119.

The contract approved by the Area Director in March 1992 contained several other clauses relevant to this appeal. It included an arbitration clause which stated:

> Any dispute, controversy or question of interpretation arising under, out of, or in connection with this Agreement or any amendments hereof, or any breach or default hereunder, shall be submitted to and determined and settled by arbitration in the State of Minnesota, in accordance with the applicable rules of the American Arbitration Association then in effect.

Id. at A-49-50. It also included a limited waiver of the Band's sovereign immunity so that Gaming World could seek to enforce the contract, id. at A-50, and several seemingly contradictory clauses related to the date when the contract would become

effective. One of these clauses said the contract would commence "on the date it is approved by the Bureau of Indian Affairs," id. at A-31, another stated that "As of this date, this Agreement is in full force and effect," id. at A-58, and a third indicated that the agreement would be binding when approved by the Secretary or his delegate unless IGRA were to require its submission to the NIGC Chair for approval:

> The parties to this Agreement anticipate that said Agreement will be approved by the Secretary of the Interior or his delegate pursuant to the provisions of [IGRA] and recognize that such approval causes this Agreement to be binding upon the parties until such time in the future as the Agreement shall be amended. The parties to this Agreement also recognize that [IGRA] may require the Band to submit this agreement to the Chairman of the National Indian Gaming Commission for approval by the Chairman. If so required, the parties hereto agree to submit this Agreement.

Id. at A-31-32.

The Band appealed the Area Director's March 6, 1992 decision to IBIA, id. at A-242, which issued its decision in early March 1993, the month after NIGC had begun to function. IBIA affirmed that part of the Area Director's decision limiting the contract term to five years and setting the division of profits at seventy percent for the Band and thirty percent for Gaming World. It vacated that part of the decision requiring the Band's construction costs be repaid from gross revenues, however, and remanded the matter to the Area Director for "further consideration." White Earth Band of Chippewa Indians, 23 I.B.I.A. 216, 227 (Mar. 3, 1993). No reference was made to the fact that NIGC had become operational or that IGRA and the relevant regulations required final approval or disapproval of a management contract by the Chairman of NIGC, 25 U.S.C. § 2705(a)(4); 25 C.F.R. § 533.1(a)-(b).

On April 23, 1993, the Area Director wrote a letter to Darrell "Chip" Wadena, chairman of the White Earth Tribal Council. App. at A-488. The Area Director

advised in this letter that the funds obtained from the Band's WELSA trust fund for construction of the casino were actually disbursements and required no repayment:

> Contrary to our original assumption in this matter, funds borrowed from a Bureau trust fund account, such as the White Earth Tribal Government and Economic Development fund...do not have to be repaid in any form or manner. The funds should be considered a disbursement and not a loan.

Id. According to the Area Director, this meant that the $11,800,000 drawn from the Band's trust fund would not have to be repaid from casino revenues, neither from gross revenues (as provided in the March 6, 1992 contract approved by the Area Director but vacated by IBIA), nor from the Band's share of net profits (as originally contemplated by the parties).

The April 23 letter also indicated that the Area Director expected that the issue remanded from IBIA would not be resolved by him, but by the parties submitting a revised contract for final approval or disapproval by NIGC. Even if the funds withdrawn from the WELSA trust did not have to be reimbursed, the repayment of the Band's $5,500,000 commercial loan remained at issue. The Area Director's letter advised:

> the gaming management agreement with Gaming World International, Inc., will also need to be revised to reflect the change in required repayment. We assume, however, that you will address those revisions directly with the National Indian Gaming Commission along with those issues remanded back to the Bureau in the Interior Board of Appeals decision of March 3, 1993.

Id. at 489. It does not appear from the record that the parties ever followed this suggested procedure, presumably because they had begun to operate under a new amendment they had agreed to in the meantime.

-6-

While the appeal of the Area Director's March 6, 1992 decision was pending before IBIA, the parties had decided on November 5, 1992 to make a further amendment to their agreement.  Id. at A-353.  This amendment was to "be integrated in and made a part of the earlier agreement between the parties dated March 6, 1992" and to cancel "all provisions of prior agreements, which are inconsistent" with the amendment.  Id.  The November 1992 amendment contained new provisions for construction of certain improvements to the casino, lengthened the contract term to seven years, reallocated profits sixty five percent to the Band and thirty five percent to Gaming World, and reaffirmed the Band's limited waiver of sovereign immunity. Id. at 356-58.  The amendment also stated its terms were "contingent upon...the approval of the United States, Bureau of Indian Affairs or the Chairman of the National Indian Gaming Commission as required by law."  Id. at 358.  Although the parties began to perform under the terms of this amended agreement in May 1993, they did not submit it to NIGC until August, 1994.[1]

NIGC Chairman Harold A. Monteau rejected the November 5, 1992 amendment in a letter dated November 19, 1996, id. at A-141, which also stated that the Commission was not going to "review the [underlying] contract and require changes" or "require the parties to go through the extensive process to bring it in compliance" with IGRA.  Id. at A-143.  Monteau's letter stated that the November 1992 modification had been constructively denied as of September 1994 because the Commission had taken no action on it within thirty days, see 25 C.F.R. § 535.1(d), but that the amendment would also have been rejected upon complete review.  App. at 141-43.  The letter concluded by saying:

> Finally, as part of our review of the amendment, we also called in the underlying contract between the parties.  We have decided that it is

---

[1]We have found nothing in the record to explain why the parties did not begin performing under their November 5, 1992 amendment until May 1993, or why they did not submit the amendment to NIGC until August 1994.

neither necessary nor appropriate at this time to review the contract and require changes. The contract is very close to expiring on its own terms, and its provisions were not such that we believed it essential to require the parties to go through the extensive processes to bring it in compliance with the Indian Gaming Regulatory Act. More importantly, we have been advised that the parties have terminated their relationship. Therefore, we intend to take no further action on the contract.

Id. at 143. Although the letter notified the parties of their right to appeal within thirty days, id. at 141, no appeal was filed. The November 5, 1992 amendment thus never received final approval, and neither party presently contends it is valid or seeks to enforce its terms. The record also does not indicate that either party protested or appealed the Chairman's announcement that NIGC had decided not to review the March 6, 1992 agreement "at this time."

The Band terminated the casino management contract with Gaming World by a resolution dated August, 12 1996, after a change in its leadership. Id. at A-289-92. Wadena, tribal chairman when the parties first reached agreement in 1991, and two other members of the tribal council had been convicted of federal crimes on June 25, 1996, including conspiracy to use tribal funds in the construction of the casino for personal gain, in violation of 18 U.S.C. §§ 371, 666, and 1163. See, e.g., United States v. Wadena, 152 F.3d 831, 837-39 (8th Cir. 1998). After the reconstituted tribal council conducted an investigation, it concluded that the contract lacked proper federal approval because neither the Area Director nor the Chairman of NIGC had ever addressed the issue remanded by IBIA.

Shortly after the tribal council acted to terminate the management contract, Gaming World initiated an arbitration proceeding against the Band. App. at A-60, 62. Gaming World claimed that the Band had breached the March 6, 1992 contract "as amended" and sought to recover $3,200,000 in casino profits (including undistributed profits it alleged were owing, for the period August 12, 1996 to

March 6, 1997, and underpayments from March 6, 1992 to August 12, 1996). Id. at A-63. The Band counterclaimed for damages of approximately $22,000,000, claiming there had been excess distribution of profits to Gaming World. Id. at A-580-81. Arbitrators were appointed in the summer of 1997, and a final arbitration hearing was scheduled for May 3, 1999. Approximately ten days before the scheduled arbitration hearing, the Band moved for a continuance so that it could file an action in federal court seeking a declaration that the management contract had never received proper federal approval. Id. at A-613. The motion for continuance was granted.

The White Earth Band of Chippewa Tribal Court had meanwhile been established on November 3, 1997, id. at A-637, 651 and the Band filed an action in that court on November 30, 2000. The Band states that this filing was delayed by difficulties in obtaining necessary records from Wadena and his coconspirators. In its action the Band requested a declaration that the March 6, 1992 contract was void and also asserted a qui tam claim under 25 U.S.C. § 81. The qui tam claim sought to recover on behalf of the United States approximately $12,000,000 in casino proceeds wrongfully received by Gaming World, payments which it says were made under a void contract and were thus recoverable under § 81 as excess payments.[2] Id. at A-314. Gaming World filed a responsive pleading on December 12, 2000, in which it

---

[2]Section 81 permitted a private party to assert a claim in the name of the United States to recover payments in excess of contractual amounts approved by the Secretary of the Interior or the Commissioner of Indian Affairs, including payments made by an Indian tribe to a third party for services related to Indian lands. See 25 U.S.C. § 81. A successful qui tam relator could receive half of any recovery, with the remainder "paid into the Treasury for the use of the Indian or tribe." Id.

Section 81 was repealed by a statute enacted on February 29, 2000, which said nothing about whether Congress intended to bar parties from asserting preexisting § 81 claims. The Indian Tribal Economic Development and Contract Encouragement Act, Pub. L. 106-179.

challenged the tribal court's jurisdiction, denied the Band's material allegations, and counterclaimed for lost profits under the March 6, 1992 contract. Id. at A-630-34.

Approximately one month after the Band filed its action in tribal court, Gaming World filed this petition in federal court seeking a declaratory judgment that the March 6, 1992 agreement is valid as approved by IBIA, as well as an order compelling arbitration. The Band's responsive pleading asserted that the federal court lacked jurisdiction and that the March 6, 1992 contract was void in its entirety for lack of valid federal approval.

Gaming World filed a motion to compel arbitration, and the district court granted it from the bench. The court concluded that it had jurisdiction under 28 U.S.C. § 1331 because the question of the validity of the March 6, 1992 contract raised issues of federal law under IGRA, that the Federal Arbitration Act (FAA), 9 U.S.C. § 1 et seq., applied because the contract affected interstate commerce, and that the arbitration clause was severable and binding, regardless of whether the contract as a whole were void. It cited Prima Paint Corp. v. Flood and Conklin Mfg. Co., 388 U.S. 395, 402-04 (1967), as authority to grant the motion to compel, and the Band appealed.

The Band argues on appeal that the arbitration clause cannot be separately enforced in the circumstances of this case, that the validity of the management contract as a whole must be considered, as well as the effect of its limited waiver of sovereign immunity. It asserts that the policy favoring exhaustion of tribal remedies requires that the validity of the contract be litigated first in tribal court and that the contract is void for lack of proper federal approval. Gaming World responds that a federal court should not defer to a tribal court which did not exist when it first sought arbitration, that the arbitration clause is severable and enforceable, that the arbitration clause implies a limited waiver of sovereign immunity for purposes of enforcing it, and that the validity of the contract is an issue for the arbitrators.

-10-

II.

Before turning to the substantive issues raised by the parties, we must first determine whether there is jurisdiction over this matter. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998); Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 541 (1986). We review de novo the district court's conclusion that it had subject matter jurisdiction. See Gilbert v. Monsanto Co., 216 F.3d 695, 699 (8th Cir. 2000).

Diversity jurisdiction is not available here under 28 U.S.C. § 1332 because Indian tribes are neither foreign states, Cherokee Nation v. Georgia, 5 Pet. (30 U.S.) 1, 16-18 (1831), nor citizens of any state, Standing Rock Sioux Indian Tribe v. Dorgan, 505 F.2d 1135, 1140 (8th Cir. 1974). Federal question jurisdiction can exist under 28 U.S.C. § 1331 if Gaming World's petition states a claim arising under federal law, but jurisdiction cannot be founded on anticipated defenses or responsive pleadings. See Iowa Mgmt. & Consultants, Inc. v. Sac & Fox Tribe of the Mississippi in Iowa, 207 F.3d 488, 489 (8th Cir. 2000).

In its petition Gaming World seeks both declaratory relief and an order to compel arbitration, but it must also invoke federal substantive law for there to be jurisdiction. Federal courts may entertain claims for declaratory relief under 28 U.S.C. § 2201, so long as they raise a federal question. Victor Foods, Inc. v. Crossroads Econ. Dev. of St. Charles County, Inc., 977 F.2d 1224, 1227 (8th Cir. 1992). The FAA also does not alone confer federal jurisdiction. See 9 U.S.C. § 4; Moses H. Cohn Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 26 n.32 (1983). If a declaratory judgment action requires resolution of an issue of federal law or precludes the assertion of a federal right by a responding party, there is jurisdiction over it. See Franchise Tax Bd. v. Constr. Laborers Vacation Trust, 463 U.S. 1, 19 (1983); 10B Charles Alan Wright et al., Federal Practice and Procedure: Civil 3d § 2767 (1998). Gaming World's petition seeks a declaratory judgment that the March 6,

1992 contract received valid federal approval and is therefore enforceable. The district court concluded that this claim for relief requires interpretation of federal statutes, and we agree.

In terms of jurisdiction there is a significant distinction between ordinary contract disputes involving Indian tribes, TTEA v. Ysleta Del Sur Pueblo, 181 F.3d 676, 681 (5th Cir. 1999), and those raising issues in an area of extensive federal regulation. See Comstock v. Alabama and Coushatta Indian Tribes, 261 F.3d 567 (5th Cir. 2001), cert. denied, 122 S.Ct. 1438 (2002). Thus, the "extensive regulatory scheme" governing tribal oil and gas leases conferred federal jurisdiction over a contract dispute between a tribe and two oil companies in Comstock. Id. at 574-75. The regulatory scope of IGRA is similarly far reaching in its supervisory power over Indian gaming contracts. The Eleventh Circuit has concluded that IGRA and NIGC regulations so dominate the area of tribal gaming that they are incorporated into gaming contracts by operation of law, see Tamiami Partners, Ltd. v. Miccosukee Tribe of Indians, 63 F.3d 1030, 1047 (11th Cir. 1995), and our court has recognized that IGRA completely preempts state law with respect to Indian gaming. See Gaming Corp. of America v. Dorsey & Whitney, 88 F.3d 536, 547 (8th Cir. 1996).

Since this case raises issues under the extensive regulatory framework of IGRA, it is not a routine contract dispute. Our decisions illustrate the distinction. If a management company alleges only a "routine contract action" against a tribe, such as a claim that the tribe has violated a consulting agreement not subject to regulation under IGRA, the complaint does not invoke federal jurisdiction. See Iowa Mgmt. & Consultants, Inc., 207 F.3d at 488-89. Similarly, an issue of individual authority to sign on behalf of a tribe is "not...a federal question per se." See Bruce H. Lien Co. v. Three Affiliated Tribes, 93 F.3d 1412, 1421 (8th Cir. 1996). By contrast, the petition in this case raises the issue of whether the March 6, 1992 contract received valid federal approval under the IGRA regulatory scheme. It thus invokes federal jurisdiction.

Moreover, an action filed in order to avoid tribal court jurisdiction necessarily asserts federal law. National Farmers Union Ins. Co. v. Crow Tribe of Indians, 471 U.S. 845, 853 (1985). See also Iowa Mut. Ins. Co. v. LaPlante, 480 U.S. 9, 15 (1987); TTEA, 181 F.3d at 683; Kerr-McGee Corp. v. Farley, 115 F.3d 1498, 1501 (10th Cir. 1997) (affirming stay of federal court proceedings to allow tribal court to determine its own jurisdiction). It is well established that the scope of tribal court jurisdiction is a matter of federal law. See National Farmers Union Ins. Co., 471 U.S. at 852; Iowa Mut. Ins. Co., 480 U.S. at 15.

The jurisdictional facts in this case are very similar to those in Bruce H. Lien Co., 93 F.3d at 1421-22, which also involved a casino dispute in which a management company went to federal court for an order to compel arbitration after a tribe had filed a declaratory action in tribal court. We concluded in that case that there was federal jurisdiction over the matter because the issue of the "existence of tribal court jurisdiction itself presents a federal question within the scope of 28 U.S.C. § 1331." Id.; see also TTEA, 181 F.3d at 683 (finding jurisdiction to determine whether tribal court properly exercised jurisdiction over § 81 claim).[3] Here, Gaming World's petition is an attempt to circumvent the Band's previously filed action in tribal court, and we have jurisdiction to determine the scope of tribal court jurisdiction and whether comity requires deference to that court in the first instance. See Bruce H. Lien Co., 93 F.3d. at 1421-22.

---

[3]The qui tam claim filed in tribal court might also provide another basis for federal jurisdiction if Gaming World's petition would preclude assertion of a federal right by the Band. See Franchise Tax Bd., 463 U.S. at 19. Because there are other grounds for jurisdiction, we need not decide whether the Band's § 81claim is a viable federal right. We note, however, that the Band would be entitled to half of any recovery as relator and to the other half as the beneficiary. But see TTEA, 181 F.3d at 682-83 (claim brought in name of United States not a federal right of the relator).

After examining the issues, we conclude that we have jurisdiction and affirm the ruling of the district court on this point.

III.

The Band argues that the district court erred by granting the motion to compel arbitration instead of "staying its hand" so that tribal court remedies could be exhausted. Gaming World contends that the tribal exhaustion doctrine should not be applied because the White Earth Band of Chippewa Tribal Court did not exist at the time it commenced arbitration proceedings, the arbitration clause is itself valid and enforceable, and the validity of the March 6, 1992 agreement should be decided by the arbitrators, citing Prima Paint Corp., 388 U.S. at 402-4 (arbitration clause in contract involving interstate commerce is severable and enforceable unless there are questions about the formation or validity of the clause itself). The Band responds that in this case there is a valid issue about the formation of the management agreement, including the arbitration clause, because the contract never received the necessary federal approval and is therefore void.

The issue of tribal exhaustion is a threshold one because it determines the appropriate forum. The tribal exhaustion doctrine, first enunciated by the Supreme Court in Nat'l Farmers Union Ins. Co., 471 U.S. at 853-57, and further developed in Iowa Mut. Ins. Co., 480 U.S. at 15-18, favors exhaustion of available remedies in tribal court before a collateral or parallel federal court action may proceed. See Basil Cook Enter., Inc. v. St. Regis Mohawk Tribe, 117 F.3d 61, 65 (2d Cir. 1997). A federal court should "stay [] its hand until after the Tribal Court has had a full opportunity to determine its own jurisdiction." National Farmers Union Ins. Co., 471 U.S. at 857. Tribal courts presumptively exercise civil jurisdiction over the activities of non Indians on reservation lands "unless affirmatively limited by a specific treaty

-14-

provision or federal statute," <u>Iowa Mut. Ins. Co.</u>, 480 U.S. at 18, and no treaties or statutes limiting tribal court jurisdiction in the circumstances here have been cited.[4]

The tribal exhaustion doctrine is based on "a policy of supporting tribal self-government and self-determination," <u>Nat'l Farmers Union Ins. Co.</u>, 471 U.S. at 856, and it is prudential, rather than jurisdictional. <u>See</u> <u>Iowa Mut. Ins. Co.</u>, 480 U.S. at 20 n.14. Exhaustion is mandatory, however, when a case fits within the policy, <u>Duncan Energy Co. v. Three Affiliated Tribes</u>, 27 F.3d 1294, 1300 (8th Cir. 1994); <u>Burlington N. R.R. Co. v. Crow Tribal Council</u>, 940 F.2d 1239, 1245 (9th Cir. 1991), and the legal scope of the doctrine is a matter of law to be reviewed de novo. <u>See</u> <u>Bowen v. Doyle</u>, 230 F.3d 525, 530 (2d Cir. 2000); <u>U.S. v. Tsosie</u>, 92 F.3d 1037, 1041 (10th Cir. 1996).

Federal courts have deferred to tribal courts in circumstances similar to those here. The facts in <u>Bruce H. Lien Co.</u> are very close to this case. There, a management company went to federal court for an order to compel arbitration after a tribe had filed a declaratory judgment action in tribal court questioning the validity of a gaming contract. 93 F.3d at 1415-16. We held that the tribal exhaustion doctrine applied and that the tribal court should be "given the first opportunity to address [its] jurisdiction and explain the basis (or lack thereof) to the parties." <u>Id.</u> at 1421. Federal court restraint is "especially appropriate" where the issues between the parties grow out of "[t]ribal governmental activity involving a project located within the borders of the reservation." <u>Id.</u> at 1420. Other circuit courts have also applied the tribal exhaustion doctrine in cases involving questions of arbitrability and validity of

---

[4]The White Earth Band of Chippewa Tribal Court is authorized to exercise jurisdiction "over all persons [including corporations] whose actions involve or affect the White Earth Band of Chippewa or its members, and over persons who enter into consensual relationships with the Band or its members through commercial dealings, contracts, leases, or other arrangements." White Earth Band of Chippewa Judicial Code, Ch. 2, § 1(c).

contracts. In <u>Bank One, N.A. v. Shumake</u>, 281 F.3d 507, 514 (5th Cir. 2002), <u>cert. denied</u>, 123 S.Ct. 94 (2002), the Fifth Circuit affirmed the dismissal of a bank's complaint seeking an order for arbitration in order to permit a previously filed tribal court action to proceed. The Fifth Circuit concluded that since Congress had not provided for federal jurisdiction in the FAA, that statute's mechanism favoring arbitration should not override the federal policy of deferring to tribal courts. <u>Id.</u> (diversity jurisdiction "not a sufficient basis to override the federal policy of deference to tribal courts"). The Ninth Circuit reached a similar conclusion in <u>Stock West, Inc. v. Confederated Tribes</u>, 873 F.2d 1221, 1227-29 (9th Cir. 1989), in which it rejected the argument that the FAA's implicit policy of favoring arbitration "should overcome the policy of comity in favor of the tribal court," particularly where "the validity of the arbitration clauses in the contracts are themselves in dispute." <u>Id.</u> at 1228 n.16. <u>See also</u> <u>Basil Cook Enter., Inc. v. St. Regis Mohawk Tribe</u>, 117 F.3d 61, 63-69 (2d Cir. 1997) (management company's federal petition seeking order to compel arbitration dismissed because of pending action in tribal court).

We agree with the reasoning of these cases which is consistent with the longstanding federal policy supporting the development of tribal courts. As the Supreme Court explained in <u>Nat'l Farmers Union Ins. Co.</u>:

> Our cases have often recognized that Congress is committed to a policy of supporting tribal self-government and self-determination. That policy favors a rule that will provide the forum whose jurisdiction is being challenged the first opportunity to evaluate the factual and legal bases for the challenge.

471 U.S. at 856. <u>See also</u> <u>Iowa Mutual Ins. Co.</u>, 408 U.S. at 15 ("a federal court's exercise of jurisdiction over matters relating to reservation affairs can...impair the authority of tribal courts"); <u>Merrion v. Jicarilla Apache Tribe</u>, 455 U.S. 130, 138 n.5 (1982) ("Through various Acts governing Indian tribes, Congress has expressed the purpose of fostering 'tribal self government.'"); <u>White Mountain Apache Tribe v.</u>

Bracker, 448 U.S. 136, 143-44 (1980) (noting "firm federal policy" supporting tribal self-sufficiency). This policy would be undermined if Gaming World were permitted to evade the jurisdiction of the White Earth Band of Chippewa Tribal Court over the previously filed declaratory judgment action there.

Gaming World argues that it should be excused from exhaustion for several reasons. It points out that the tribal court was not available when it originally filed for arbitration, but that court was instituted, operating, and available by the time Gaming World filed its federal petition on January 2, 2001. This case is therefore not like Krempel v. Prairie Island Indian Community, 125 F.3d 621, 623 (8th Cir. 1997), where the tribal court was not operational until after the federal claim had been filed. Cf. Iowa Mut. Ins. Co., 480 U.S. at 19 (tribal exhaustion requires exhaustion of "available tribal remedies before instituting suit"). Gaming World also argues that a federal court need not defer if the party seeking exhaustion has acted in bad faith or with the intent to harass, if the matter clearly exceeds tribal court jurisdiction, or if exhaustion would be futile for lack of adequate opportunity to challenge the tribal court's jurisdiction. National Farmers Union Ins. Co., 471 U.S. at 856 n.21; Bruce H. Lien Co., 93 F.3d at 1420 n.14. Gaming World accuses the Band of acting in bad faith because it asked for a stay of arbitration so it could file a declaratory judgment action in federal court, but later filed it in tribal court. The Band responds that its filing was necessarily delayed by the difficulty in obtaining records from Wadena and his coconspirators and that it only subsequently decided to file in tribal court. We conclude that the record does not indicate either bad faith or any basic jurisdictional problem. Compare Comstock, 261 F.3d at 572 (exhaustion inapplicable where the tribal court had not been authorized by law). There is also no indication that the arbitrators would have refused a stay if the Band had stated it would file in tribal court or that exhaustion would be futile because Gaming World would not have adequate opportunity to raise any and all issues in tribal court, including any challenges to its jurisdiction.

We conclude that the district court erred by not deferring for exhaustion of tribal court remedies and by proceeding to rule on the motion to compel arbitration.[5] Our decision in <u>Bruce H. Lien Co.</u> and those in similar cases decided by the Fifth, Ninth, and Second Circuits teach that exhaustion should be required when a party tries to avoid tribal court jurisdiction by seeking an order to compel arbitration in federal court. This is especially true if the underlying dispute involves activities undertaken by tribal government within reservation lands. Failure to require

_____

[5]In its oral ruling that the validity of the management agreement was for the arbitrators, the district court made no reference to the record but simply stated that the arbitration clause was "a separate contract, severable from the larger contract" that it needed no federal approval, and that it evidenced no "irregularity or any fraud" in its creation. Hearing Tr. 7/6/2001 at 23-24. The court named only <u>Prima Paint</u> as support for its conclusion.

In <u>Prima Paint</u> the Supreme Court explained that arbitration should be ordered once a court "is satisfied that 'the making of the agreement for arbitration...is not in issue.'" 388 U.S. at 404 (quoting 9 U.S.C. § 4). Nevertheless, the question of arbitrability itself is an issue for the court unless the parties have unmistakably agreed otherwise, <u>AT & T Technologies, Inc. v. Communications Workers of Am.</u>, 475 U.S. 643, 649 (1986), and the Supreme Court has recently elucidated the difference between a question of arbitrability for the court and a gateway question which is for the arbitrator to decide. <u>Howsam v. Dean Witter Reynolds, Inc.</u>, 123 S.Ct. 588, 592 (2002). "[A] gateway dispute about whether the parties are bound by a given arbitration clause raises a 'question of arbitrability' for a court to decide." <u>Id.</u> Whether a nonsigning party or a successor corporation is bound by an arbitration agreement or whether a "particular type of controversy" is covered by an "arbitration clause in a concededly binding contract" are examples of issues to be decided by the court. <u>See id.</u> Conversely, whether grievance procedures have been followed or time limits satisfied are examples of issues to be decided by the arbitrator. <u>See id.</u> The key is whether the question is one the parties would likely have expected to be decided by the court or the arbitrator. <u>See id.</u> The parties in this case of course differ on the potential impact of the complicated regulatory background on the arbitrability issue.

exhaustion in these circumstances would undermine the important federal policy to foster tribal self government through the development of tribal courts as enunciated in Nat'l Farmers Union Ins. Co. and Iowa Mut. Ins. Co..

Deferral to the tribal court will give the parties the opportunity to raise their various arguments in that forum in the first instance. The first filed declaratory action encompasses all of the issues between the parties, including the Band's asserted § 81 qui tam claim. Gaming World's subsequent petition for declaratory relief and arbitration was a clear attempt to evade tribal court jurisdiction, and "all issues relating to the Tribal Court's jurisdiction...should be dealt with first by the Tribal Court itself." Bruce H. Lien Co., 93 F.3d at 1420-21.

IV.

Accordingly, we reverse the decision of the district court not to defer to the tribal court in the first instance and vacate its order granting the motion to compel arbitration. We remand to the district court with instructions to stay or dismiss this action without prejudice in order to permit the parties to exhaust their tribal court remedies. See Nat'l Farmers Union Ins. Co.,471 U.S. at 857; Bruce H. Lien Co., 93 F.3d at 1422.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS,  EIGHTH CIRCUIT.

-19-